951 So.2d 187 (2006)
Christiane Gullung Hymel, Wife of/and Charles Stewart HYMEL, Jr. and Their Minor Children, Myles Stewart Hymel and Abigail Pattin Hymel and Her Minor Child, Caitlyn Elizabeth Williams
v.
HMO OF LOUISIANA, INC. d/b/a HMO Louisiana, Inc.
No. 2006 CA 0042.
Court of Appeal of Louisiana, First Circuit.
November 15, 2006.
Writ Denied February 16, 2007.
*191 Paul A. Lea, Jr., Covington, for Plaintiffs Appellees/Cross-Appellants Christine Gullung Hymel, et al.
Richard J. Tyler, Amy L. Glovinsky, New Orleans, Charles A. O'Brien, Baton Rouge, for Defendants Appellants HMO Louisiana, Inc.
Before: KUHN, GAIDRY, and WELCH, JJ.
WELCH, J.
This is an appeal by the defendant, HMO of Louisiana, Inc. d/b/a HMO Louisiana, Inc. ("Blue Cross"[1]), from a judgment rendered in favor of the plaintiffs, Christiane Gullung Hymel, Charles Stewart Hymel, Jr., and their minor children, finding Blue Cross liable for damages; penalties, and attorney fees, because it refused to pre-certify and denied Mrs. Hymel's claim for a medically necessary MRI scan, which resulted in a three month delay in the diagnosis and surgical removal of a malignant tumor in Mrs. Hymel's spinal cord. The plaintiffs have answered the appeal, seeking an increase in the awards for future medical expenses and attorney fees. For reasons that follow, we amend the judgment, and as amended, affirm.

I. FACTUAL HISTORY
Christiane and Charles Hymel have been married for approximately ten years. Together, they have two children, and Mrs. Hymel has one child from a previous marriage. Sometime after the birth of Mrs. Hymel's third child in 1999, she began experiencing back and neck pain, which she attributed to the epidural she received during childbirth and to the position she held her neck while feeding her baby.
In late November and early December of 1999, Mrs. Hymel sought treatment for her back and neck pain with a chiropractor, Dr. H.J. "Nicky" Nicaud, Jr. After several office visits/treatments with Dr. Nicaud, Mrs. Hymel's pain subsided. In August 2000, the back and neck pain returned and Mrs. Hymel again sought treatment with Dr. Nicaud. During the time periods that Mrs. Hymel treated with Dr. Nicaud, neither Mrs. Hymel nor her husband had a policy of health insurance or other health benefit plan.
In mid-2000, after efforts to obtain health insurance through Mr. Hymel's employer had failed due to disinterest among the other employees, Mr. and Mrs. Hymel decided to purchase an individual health insurance policy for themselves. Mrs. Hymel placed a telephone call to Blue Cross and spoke to Mr. William Artell, the Blue Cross agent "on duty." Due to the high cost of obtaining health insurance for Mr. Hymel, because he was a smoker and had other medical problems, the Hymels chose to obtain a policy for Mrs. Hymel only. Thereafter, Mr. Artell went to Mrs. Hymel's home, and he assisted her in completing an application for individual health coverage. On the application, Mrs. Hymel *192 chose an individual point of service[2] ("POS") policy, rather than a health maintenance organization[3] ("HMO") policy, and she designated Dr. Jacques L. Guillot as her primary care physician. Mrs. Hymel's application was submitted to Blue Cross on September 29, 2000, and thereafter, Blue Cross issued the POS policy to Mrs. Hymel with an effective date of October 15, 2000.
Having obtained coverage, Mrs. Hymel scheduled an appointment with her primary care physician for a routine check-up and physical examination. On October 20, 2000, during this examination, Mrs. Hymel reported to Dr. Guillot her history of back pain and pain/weakness in her legs over the past year and a half. Dr. Guillot ordered and obtained x-rays of Mrs. Hymel's cervical and lumbar spine,[4] and then he referred Mrs. Hymel to Dr. Srinivas Ganji, a neurologist.
On November 13, 2000, Mrs. Hymel went to see Dr. Ganji. During the office visit, Dr. Ganji performed several clinical tests on Mrs. Hymel, including the "Babinski" test.[5] Although Dr. Ganji noted Mrs. Hymel's complaints of prior back and neck pain, Dr. Ganji was more concerned with other deficits in her neurological functioning and believed that that Mrs. Hymel was suffering from a "demyelinating disorder," such as multiple sclerosis. Accordingly, he ordered an MRI scan of Mrs. Hymel's cervical, thoracic, and lumbrosacral spine.[6]
Dr. Ganji's office scheduled the MRI for December 5, 2000, and in accordance with Mrs. Hymel's policy, sent Blue Cross a request to pre-certify the service/diagnostic test with a "diagnosis code" of multiple sclerosis. Blue Cross then requested and obtained Mrs. Hymel's medical records from Dr. Guillot, which noted her history of back pain, but it did not request Mrs. Hymel's records from Dr. Ganji, who actually ordered the MRI scan. On December 4, 2000, Blue Cross denied the request to pre-certify the claim for the MRI on the basis that the service was for a pre-existing condition, i.e. Mrs. Hymel's back pain, and therefore, the service was not covered under the terms of the policy. On December 6, 2000, Mrs. Hymel appealed Blue Cross's decision in accordance with the terms of her policy. Although Blue Cross *193 received the appeal on December 14, 2000, it never processed the appeal.
After Blue Cross denied the request for the MRI, Mr. and Mrs. Hymel were told that the MRI would cost them approximately $4,000.00. Approximately three months later, when Mr. and Mrs. Hymel had accumulated most of the necessary funds to pay the expense themselves, an MRI scan was performed on Mrs. Hymel's spine on March 2, 2001.[7] The results of the MRI indicated that Mrs. Hymel had "[e]xtensive syringomyelia" involving "nearly the entire cervical and thoracic [spinal] cord." Upon receiving and reviewing the results of Mrs. Hymel's MRI, Dr. Ganji immediately referred her to Dr. Deepak Awasthi, a neurosurgeon.
After Dr. Awasthi reviewed the results of the MRI scan, he diagnosed Mrs. Hymel with a tumor located inside her spinal cord (or an "ependymoma"[8]) which spanned both the cervical and thoracic spinal cord, with a cystic or "fluid filled" cavity (or a "syringomyelia"). Dr. Awasthi immediately scheduled Mrs. Hymel for surgery in order to remove the tumor. Blue Cross denied the request for the surgical procedure by Dr. Awasthi on the basis that it was for a pre-existing condition, and it also denied the accompanying request for hospital admission based on "medical need."
Notwithstanding Blue Cross's denial of the claims for the requested services, Dr. Awasthi agreed to and did perform surgery on Mrs. Hymel on March 30, 2001, at the Medical Center of Louisiana at New Orleans (also known as "Charity Hospital"). Due to the size of the tumor and the accompanying difficulty in its surgical removal, Mrs. Hymel sustained permanent injuries to her spinal cord resulting in several permanent disabilities. Additionally, in 2004, Mrs. Hymel's tumor recurred, and a second surgery was performed. Blue Cross paid for all services associated with Mrs. Hymel's second surgery.

II. PROCEDURAL HISTORY
On October 24, 2001, Mr. and Mrs. Hymel and their children instituted this action against Blue Cross,[9] alleging that Blue Cross was liable to them for the damages sustained by Mrs. Hymel, for penalties and for attorney fees due to its failure to comply with La. R.S. 22:657, for its breach of the POS policy (contract), and for its general negligence. Blue Cross answered the petition, setting forth affirmatively that it had acted prudently, reasonably, and with probable cause in rejecting the claims of Mrs. Hymel; that the condition for which Mrs. Hymel was treated was a "pre-existing condition" under the terms of the policy, and therefore excluded from coverage; that the plaintiffs had no cause or right of action under La. R.S. 22:657; and that the plaintiffs had no claim for bodily personal injuries arising from the alleged breach of contract. Alternatively, *194 Blue Cross contended that if coverage existed under the contract, then the only benefits payable were those in accordance with the policy/contract and the contracts between Blue Cross and the health-care providers, without regard for the amount of Mrs. Hymel's medical bills.[10]
On February 2, 3, and 4, 2005, the matter was tried before a jury.[11] After the conclusion of the evidence but prior to charging the jury, the parties stipulated that the trial court would determine whether La. R.S. 22:657(A) and (D) were applicable to the plaintiffs claims against Blue Cross, and thereafter, depending on the verdict of the jury, would determine the amount of penalties and attorney fees to be awarded.
The jury's verdict unanimously found that Mrs. Hymel did not have a "pre-existing condition" as defined by the contract; that the defendant failed to perform its obligations under the contract with Mrs. Hymel, which resulted in an unreasonable denial of proposed medically necessary services to Mrs. Hymel; that the defendant was not in bad faith in failing to perform its obligations under the contract with Mrs. Hymel; that the health insurance contract was not intended to gratify a nonpecuniary interest of Mrs. Hymel; that the failure of the defendant to perform its obligations under the contract was a direct and proximate cause of the damages sustained by Mrs. Hymel; and that Mrs. Hymel sustained damages as follows:

 Physical injuries including pain and
 suffering $ 50,000.00
 Mental anguish and loss of enjoyment
 of life $2,000,000.00
 Past medical expenses $ 69,830.43
 Future medical expenses $ 15,000.00

Immediately thereafter, the trial court rendered judgment finding that the provisions of La. R.S. 22:657(A) and (D) were applicable to the POS policy issued by Blue Cross to Mrs. Hymel. After a subsequent hearing on the issue of penalties and attorney fees, the trial court awarded Mrs. Hymel penalties in the amount of $69,830.43 and attorney fees in the total amount of $101,600.00.[12] The trial court signed a judgment in accordance with the jury verdict and its rulings on La. R.S. 22:657 on April 14, 2005. It is from this judgment that Blue Cross appeals. Mrs. Hymel answered the appeal seeking an increase in her awards for future medical expenses and attorney fees.[13]

III. ASSIGNMENTS OF ERROR
On appeal, Blue Cross sets forth fourteen assignments of error. These assignments of error present five main issues for this court's review: (1) whether the jury's factual findings on liability, i.e. that Mrs. Hymel did not have a "pre-existing condition," *195 as defined by the contract, and on causation were manifestly erroneous; (2) whether the jury was properly instructed with the applicable law; (3) whether the provisions of La. R.S. 22:657(A) and (D) are applicable; (4) whether Mrs. Hymel was entitled to penalties and attorney fees as a matter of law; and (5) whether Mrs. Hymel was entitled to the type of damages awarded by the jury as a matter of law and whether the jury abused its discretion in the amount of damages it awarded to Mrs. Hymel.

IV. LAW AND DISCUSSION
A. Liability/Pre-existing Condition
The first issue presented to the jury was whether the tumor located inside Mrs. Hymel's spinal cord constituted a pre-existing condition under the terms of the policy between Blue Cross and Mrs. Hymel. If so, then the charges incurred for the treatment of the condition would be excluded from coverage under the terms of the policy. If not, then Blue Cross was liable for the charges incurred. The jury unanimously determined that the tumor was not a pre-existing condition. Blue Cross contends that this factual finding is manifestly erroneous because the tumor removed from Mrs. Hymel's spinal cord existed prior to the effective date of Mrs. Hymel's policy and because Mrs. Hymel experienced symptoms caused by the tumor and sought treatment for those symptoms prior to the effective date of the policy.
The standard of appellate review of the factual findings of a jury is a two-part test: (1) the appellate court must find from the record there that is a reasonable factual basis for the finding of the jury, and (2) the appellate court must further determine that the record establishes that the finding is not clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
With regard to pre-existing conditions, the Blue Cross policy issued to Mrs. Hymel provides:
ARTICLE XIV. LIMITATIONS AND EXCLUSIONS
Any of the limitations and exclusions listed in this Contract may be deleted as shown in the Schedule of Benefits.[14] Unless otherwise shown as covered in the Schedule of Benefits, the following are not covered, regardless of any claim of Medical Necessity.
. . . .
59. Any charges incurred for Pre-Existing Conditions if incurred within a Waiting Period of three hundred sixty-five (365) days following the Member's Effective Date. . . .
(Footnote added).
The policy further defined a "Pre-Existing Condition" as:
(1) a condition that would have caused an ordinary prudent person to seek medical advice, diagnosis, care, or treatment during the three hundred sixty-five (365) days immediately preceding the Effective Date of Coverage; or
(2) a condition for which medical advice, diagnosis, care, treatment, or a prescribed drug was recommended or received during the three hundred sixty-five (365) days immediately preceding the Effective Date of Coverage; or
(3) a pregnancy existing on the Effective Date of Coverage.
*196 The courts impose a strict burden on the insurer to prove that an exclusionary clause is applicable and, in the case of a health policy, that the alleged pre-existing condition did in fact predate the effective date of the policy. Savarino v. Blue Cross and Blue Shield of Louisiana, Inc., 98-0635 (La.App. 1st Cir.4/1/99), 730 So.2d 1083, 1088. The evidence required to meet this burden must be certain and decisive, leaving no room for speculation or assumption. Id. The insurer cannot meet its burden of proof by merely establishing that the illnesses were related. Id. In order to avoid liability, the insurer is required to prove that the claimant was treated for the same condition in both instances. Savage v. Louisiana Health Service and Indemnity Co., 33,853 (La. App. 2nd Cir.9/27/00), 768 So.2d 760, 765; Dorsey v. Bd. of Trustees, State Employees Group Benefits Program, 482 So.2d 735, 738 (La.App. 1st Cir.1985), writs denied, 486 So.2d 735, 736 (La.1986).
Thus, Blue Cross was required to prove that the condition for which Mrs. Hymel was being treated was the same condition that would have caused an ordinary prudent person to seek medical treatment, advice, diagnosis, care, or treatment during the 365 days prior to October 15, 2000; or for which medical advice, diagnosis, care, treatment, or a prescribed drug was recommended or received by Mrs. Hymel during the 365 days prior to October 15, 2000.
Dr. Robert Dwight Brower, a former family practitioner and presently the Medical Director of Health and Quality Management for Blue Cross of Louisiana, testified that he made the decision to deny the request to pre-certify Mrs. Hymel's claim for the MRI. Dr. Brower based this decision on the office notes Blue Cross received from Dr. Guillot, wherein Mrs. Hymel had admitted to having back pain during the year and a half prior to October 15, 2000. Dr. Brower acknowledged that while the MRI may have been the appropriate test to diagnose Mrs. Hymel's condition, he believed that the MRI was for a pre-existing condition because of Mrs. Hymel's prior complaints of back pain. Dr. Brower admitted that he did not review Dr. Ganji's medical records and he did not speak to Dr. Ganji about the reasons Dr. Ganji had ordered the MRI prior to making the determination that the MRI was ordered based on a pre-existing condition.
Dr. Thomas B. Flynn, an expert in the field of neurosurgery, also testified on behalf of Blue Cross. According to Dr. Flynn's review of Mrs. Hymel's medical records, he agreed that Mrs. Hymel had two conditions. The first was a cavitation in the spinal cord full of spinal fluid, called syringomyelia. Dr. Flynn explained that generally, syringomyelia is a congenital birth defect; however, many syringomyelia never become symptomatic and the patients never know they have the condition. Dr. Flynn stated that in Mrs. Hymel's case, the syringomyelia cavity was quite extensive and "[s]he may or may not have ever had symptoms from it." However, Mrs. Hymel's second and associated condition was a tumor growing within the cavitation, or an ependymoma. Dr. Flynn opined that Mrs. Hymel's conditions, the syringomyelia and the ependymoma, existed the first time that she saw Dr. Nicaud for her back pain, and he believed that those conditions accounted for the symptoms she complained about to Dr. Nicaud. Dr. Flynn also stated that more probable than not, the growing tumor caused Mrs. Hymel to have these symptoms because the tissue surrounding her spinal cord tissue was being compressed. Therefore, Dr. Flynn opined that the condition for which Mrs. Hymel underwent surgery in March 2001, was the same condition for which she *197 was treated by Dr. Nicaud in 1999 and in 2000 and by Dr. Ganji in 2000, and that the conditions existed prior to October 15, 2000. However, Dr. Flynn did acknowledge the possibility that the symptoms Mrs. Hymel reported to Dr. Nicaud and Dr. Ganji when considered separately, could have been attributed to other causes, and he acknowledged that there are numerous conditions associated with back and neck pain.
Dr. Ganji testified that when Mrs. Hymel first presented to him as a patient, she had relatively vague, trivial, and fleeting symptoms, and that these symptoms were not the kind of symptoms for which a normal, ordinary, and prudent person would seek medical treatment, because such a person would try to ignore the symptoms. Additionally, Dr. Ganji explained that back pain would not be a symptom of a tumor located inside the spinal cord, and thus, Mrs. Hymel would have had no reason to suspect that she had a tumor inside her spinal cord. Dr. Ganji testified that he ordered the MRI scan to determine whether Mrs. Hymel had multiple sclerosis or some other demyelinating disorder, and that he did not request the MRI because of Mrs. Hymel's complaints of back pain.
Dr. Awasthi also testified that back pain would not have been a complaint that Mrs. Hymel would have had in association with the tumor. He also testified that while Mrs. Hymel may have had the tumor well over two years before he saw Mrs. Hymel as a patient, because it was a slow growing tumor, the symptoms from the tumor that she was experiencing were "non-specific." He acknowledged that her symptoms were such that a layperson suffering from such symptoms would not know that anything particular was wrong with them.
Mrs. Hymel testified that she sought medical treatment with Dr. Nicaud for back and neck pain. Dr. Nicaud testified that he treated Mrs. Hymel for neck and back pain and that his treatment resolved her complaints. Dr. Nicaud testified that he did not believe Mrs. Hymel's back pain condition was anything out of the ordinary.
After a thorough review of the record, we cannot say that the defendant met its burden of proving that Mrs. Hymel's condition was the same condition for which she had previously received treatment or that she experienced symptoms from the tumor that would have caused a reasonable person to seek medical treatment or advice in the 365 days prior to October 15, 2000. Although Mrs. Hymel's tumor may have existed prior to the effective date of the policy, under the terms of the policy, if Mrs. Hymel did not exhibit symptoms from the condition or seek treatment or advice for the condition in the 365 days prior to the effective date of the policy, then she was not subject to the one year waiting period for the treatment of the condition. Blue Cross's medical expert testified that the tumor existed at the time Mrs. Hymel's policy went into effect, and admittedly through hindsight, related the symptoms from the tumor to the back pain and other symptoms which caused her to seek treatment with Dr. Nicaud and Dr. Ganji. However, Mrs. Hymel's treating physicians, Dr. Ganji and Dr. Awasthi, specifically indicated that Mrs. Hymel was suffering from non-specific symptoms, which were not related to any particular condition, and that her intrinsic spinal cord tumor would not have caused her to have back pain. While the treating physician's testimony is not irrebuttable, the observations and opinion of a treating physician are to be accorded greater weight than those of a physician who did not serve in that capacity. Savarino, 730 So.2d at 1089. Moreover, when there are two permissible views of the evidence, the fact *198 finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). The jury apparently concluded that Mrs. Hymel's initial back and neck symptoms were not related to the spinal cord tumor. This factual conclusion is supported by the testimony of Dr. Ganji and Dr. Awasthi. Accordingly, we find the jury's factual finding that Mrs. Hymel did not have a pre-existing condition as defined by the policy is fully supported by the record herein and is not manifestly erroneous.
B. Jury Instructions
On appeal, Blue Cross asserts that the jury was erroneously instructed with inapplicable and conflicting theories of law (La. R.S. 22:657 and general contract law), and therefore, the verdict and the judgment rendered on the verdict must be reversed and the plaintiffs' claims dismissed. Blue Cross's argument in this regard is premised on its contention that La. R.S. 22:657(A) and (D) are not applicable to Blue Cross, because it is an HMO, and therefore, the trial court's inclusion of those provisions in the jury instructions constituted reversible legal error.
In a jury trial, the judge is not required to give the instructions submitted by either party; however, the trial judge is obligated to give instructions that properly reflect the law applicable in light of the pleadings and facts in each case. Adequate instructions are those instructions which fairly and reasonably point out the issues presented by the pleadings and evidence and which provide correct principles of law for the jury's application to the facts. Haydel v. Hercules Transport, Inc., 94-1246 (La.App. 1st Cir.4/7/95), 654 So.2d 418, 429, writ denied, 95-1172 (La.6/23/95), 656 So.2d 1019. When assessing an alleged erroneous jury instruction, it is the duty of the reviewing court to evaluate such impropriety in light of the entire jury charge to determine if it adequately provides the correct principles of law as applied to the issues and whether they adequately guided the jury in its deliberation. Duzon v. Stallworth, XXXX-XXXX (La.App. 1st Cir.12/11/02), 866 So.2d 837, 858, writs denied, XXXX-XXXX, XXXX-XXXX (La.5/2/03), 842 So.2d 1101 and 1110. An appellate court must exercise great restraint before overturning a jury verdict on a suggestion that the jury instructions were so erroneous as to be prejudicial. Hurts v. Woodis, 95-2166 (La.App. 1st Cir.6/28/96), 676 So.2d 1166, 1173.
In this case, the plaintiffs' petition for damages was based on Blue Cross's alleged failure to comply with La. R.S. 22:657(A) and (D), its breach of the POS policy/contract, and its general negligence. After the conclusion of the evidence at trial and prior to closing arguments and instructing the jury, the parties stipulated that the trial court was "going to decide whether [La. R.S. 22:]657 applies." Thereafter, and over the objection of Blue Cross, the trial court instructed the jury on La. R.S. 22:657 by reading the relevant portions of the statute.[15] Additionally, the trial court instructed the jury on general contract law, including failure to perform, good faith and bad faith breach, and damages. Immediately after the jury returned its verdict and retired, the trial court ruled that La. R.S. 22:657(A) and (D) were applicable to the defendant.
For reasons detailed herein below, we agree with the trial court that La. R.S. 22:657(A) and (D) are applicable to the defendant. Thus, we cannot say that the *199 trial court's decision to instruct the jury on La. R.S. 22:657(A) and (D) prior to rendering its decision regarding the applicability of these provisions was so erroneous as to be prejudicial, because the trial court ultimately found that the provisions were applicable.
Moreover, we also find no error in the trial court's decision to include provisions concerning general contract law in the jury instructions. Under Louisiana law, the cause of action under La. R.S. 22:657 is separate and distinct from the cause of action for the breach of the insurance contract. See Cramer v. Ass'n Life Ins. Co., Inc., 563 So.2d 267, 275 (La.App. 1st Cir.1990), reversed on other grounds, 569 So.2d 533 (La.1990), cert. denied, 499 U.S. 938, 111 S.Ct. 1391, 113 L.Ed.2d 447 (1991) and Cramer, 563 So.2d at 276-77 (Lanier and LeBlanc, JJ. concurring in part and dissenting in part).
We find the instructions given to the jury, when reviewed as a whole, fairly and reasonably pointed out the issues presented by both the pleadings and the evidence, and accurately reflected the applicable law, and therefore, the trial court properly instructed the jury.
C. Applicability of La. R.S. 22:657
Blue Cross contends that La. R.S. 22:657(A) and (D) are not applicable to it.
Louisiana Revised Statutes 22:657 is contained in Chapter 1, Part XIV of the Insurance Code, and it provides, in pertinent part:
A. All claims arising under the terms of health and accident contracts issued in this state . . . shall be paid not more than thirty days from the date upon which written notice and proof of claim, in the form required by the terms of the policy, are furnished to the insurer unless just and reasonable grounds, such as would put a reasonable and prudent businessman on his guard, exist. . . . Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney's fees to be determined by the court. . . .
* * *
D. (1) In any event where the contract between an insurer or self-insurer and the insured is issued or delivered in this state and contains a provision whereby in non-emergency cases the insured is required to be prospectively evaluated through a pre-hospital admission certification, pre-inpatient service eligibility program, or any similar pre-utilization review or screening procedure prior to the delivery of contemplated hospitalization, inpatient or outpatient health care, or medical services which are prescribed or ordered by a duly licensed health care provider who possesses admitting and clinical staff privileges at an acute care health care facility or ambulatory surgical care facility, the insurer, self-insurer, third party administrator, or independent contractor shall be held liable in damages to the insured only for damages incurred or resulting from unreasonable delay, reduction, or denial of the proposed medically necessary services or care according to the information received from the health care provider at the time of the request for a prospective evaluation or review by the duly licensed health care provider, as provided in the contract; which damages shall be limited solely to the physical injuries which are the direct and proximate cause of the unreasonable delay, reduction, or denial as further defined *200 in this Subsection together with reasonable attorney fees and court costs.
Blue Cross argues that these provisions, on their face, apply only to insurers, and since Blue Cross is an "HMO," and not an "insurer," the provisions of La. R.S. 22:657(A) and (D) are inapplicable. Blue Cross also points to the fact that La. R.S. 22:657 once contained subsection (G), which mirrored subsection (A), but referred specifically to HMOs, and that the Legislature repealed that subsection by 1999 La. Acts, No. 1017 § 2. From this, Blue Cross surmises that the legislature intended that La. R.S. 22:657(A) and (D) would not apply to HMOs, even when an HMO issues a POS policy. We disagree.
Prior to its repeal by La. Acts 1999, No. 1017, § 2, La. R.S.22:657(G) provided:
Enrollee claims for reimbursement of covered services arising under the terms of health maintenance organization subscriber agreements shall be paid not more than thirty days from the date upon which written notice and proof of claim, in the form required by the terms of the subscriber agreement, are furnished to the health maintenance organization unless just and reasonable grounds, such as would put a reasonable and prudent businessman on his guard, exist. Failure to comply with the provisions of this Section shall subject the health maintenance organization to a penalty payable to the enrollee of double the amount of the benefits due under the terms of the policy or contract during the period of delay, together with attorney fees to be determined by the court. Any court of competent jurisdiction in the parish where the insured lives or has his domicile, except a justice of the peace court, shall have jurisdiction to try such cases.
When the Legislature enacted La. R.S. 22:657(G) by 1997 La. Acts, No. 1313 and when it repealed La. R.S. 22:657(G) by La. Acts 1999, No. 1017, § 2, HMOs did not have the power or authority to issue POS policies. See La. R.S. 22:2002(10) and La. R.S. 22:2006(8), enacted by 1999 La. Acts, No. 878, § 1. Accordingly, the Legislature could not have intended to exclude HMOs that issued POS policies from the provisions of La. R.S. 22:657 because HMOs did not even have the power or authority to issue such policies when that provision was enacted or when it was repealed. Moreover, even if subsection (G) had not been repealed, that provision would not be applicable to Mrs. Hymel's claims because subsection (G) applied to "enrollee claims for reimbursement under the terms of HMO subscriber agreements," where there are no out-of-pocket expenses and no claims to be filed. Mrs. Hymel's policy was not an HMO subscriber agreement, but rather a POS policy under which the member incurs charges and files a claim for benefits. According to La. R.S. 22:2002(1), Mrs. Hymel's policy with Blue Cross is a health and accident insurance policy, and La. R.S. 22:657(A), which has not been repealed, applies to "all claims arising under the terms of health and accident contracts issued in this state," and therefore, Mrs. Hymel's action against Blue Cross falls squarely under La. R.S. 22:657(A) and (D).
Moreover, we also find that Blue Cross failed to establish that it was an HMO (and not an insurer), and that the provisions of La. R.S. 22:657(A) and (D) do not apply to it. Although an HMO is generally not considered an "insurer,"[16] La. R.S. *201 22:2016(A) provides: "Except as otherwise provided in this Part and in R.S. 22:215.24, provisions of the insurance law and provisions of Part IV of Chapter 1 of this Title shall not be applicable to any health maintenance organization granted a certificate of authority under this Part." (Emphasis added). Thus, provisions of the insurance law are generally not applicable to an HMO if the HMO has been granted a certificate of authority from the commissioner of insurance. La. R.S. 22:2016(A) and 22:2004(A). As such, in order for the provisions of La. R.S. 22:657(A) and (D) to not apply to Blue Cross, Blue Cross had the burden of establishing not only its status as an HMO, but also that it had been granted a certificate of authority from the commissioner of insurance.
Based on our review of the evidence contained in the record at the conclusion of the trial, we find that Blue Cross failed to meet its burden in this regard. During the trial of this matter, Blue Cross did not present any evidence regarding its status as an HMO, which based on the plaintiffs' petition and its own answer was clearly at issue; Blue Cross repeatedly referred to itself as an "insurer," and Blue Cross failed to present a certificate of authority from the commissioner of insurance (or any other evidence demonstrating that it had been granted such a certificate), which would render the provisions La. R.S. 22:657(A) and (D) inapplicable to it. Although we do note that Blue Cross belatedly (and improperly) attempted to prove this defense post-trial at a subsequent hearing on the amount of penalties and attorney fees to be awarded, the trial court had already determined, based on the law and the evidence, that La. R.S. 22:657(A) and (D) were applicable. Accordingly, based on the law and the evidence in the record, we find no error in the trial court's determination that La. R.S. 22:675(A) and (D) were applicable to Blue Cross.
D. Assessment of penalties and Attorney fees
Under La. R.S. 22:657(A), whenever a claim is properly presented under a health and accident contract, it must be paid within 30 days, unless just and reasonable grounds exist, such as would put a reasonable and prudent businessman on his guard that the claim is unjust. Savarino, 730 So.2d at 1089; Nickels v. Guarantee Trust Life Ins. Co., 563 So.2d 924, 928 (La.App. 1st Cir.1990). What constitutes just and reasonable grounds for failing to pay is a question of fact to be determined from the circumstances of the case in question, and the factual finding on this issue should not be disturbed unless it is *202 clearly wrong. Savarino, 730 So.2d at 1089; Nickels, 563 So.2d at 928.
An insurer has an affirmative duty to verify, through reasonable investigation, whether the claim was actually excluded from coverage. Savarino, 730 So.2d at 1089. However, when an insurer chooses to resist liability based on a supposed defense, which a reasonable investigation would have proved to be without merit, it will be liable for statutory penalties and attorney fees. Id.
The jury found that Blue Cross failed to perform its obligations under its policy with Mrs. Hymel, which resulted in an unreasonable denial of proposed medically necessary benefits. We find no manifest error in this determination.
The evidence indicated that Blue Cross denied Mrs. Hymel's claim based solely on Dr. Guillot's office notes. Blue Cross never requested Dr. Ganji's medical records, and it never contacted Dr. Ganji about the reason he had requested the MRI. Had Blue Cross done so, or conducted any reasonable investigation, it would have determined that the reason Dr. Ganji had ordered the MRI was unrelated to Mrs. Hymel's prior history of back pain. Additionally, after Blue Cross denied Mrs. Hymel's claim, it failed to process her timely appeal. Accordingly, we find the jury's determination that Blue Cross unreasonably denied a proposed medically necessary service is fully supported by the record and is not manifestly erroneous. Thus, the trial court properly assessed penalties and attorney fees under La. R.S. 22:657.[17]
E. Causation
In order to recover damages under La. R.S. 22:657(D), Mrs. Hymel had to prove that her injuries were directly and proximately caused by the unreasonable delay, reduction, or denial of her request for medical services. The jury unanimously determined that Blue Cross's failure to perform its obligations under the contract was a direct and proximate cause of the damages sustained by Mrs. Hymel. Blue Cross contends that this factual finding is manifestly erroneous.[18]
Dr. Awasthi testified that tumors inside the spinal cord are "growing" tumors, and as they grow, they cause damage to vital structures in the spinal cord, which are important to walking, sensation, and breathing. Dr. Awasthi explained that the longer the wait in removing a tumor, the more damage the tumor will cause to the spinal cord, and as such, any growth of the tumor is critical. Dr. Awasthi testified that two-thirds of Mrs. Hymel's current condition and disabilities were the direct result of the growth of the tumor during the three to four month delay between the time Blue Cross denied the MRI until the time Mrs. Hymel was able to pay for it herself. Additionally, Dr. Awasthi testified that this delay also caused the tumor's quick recurrence, necessitating the second surgery. He explained that but for the growth and the delay in its removal, the while tumor would have been removed and there would have been no need for the second surgery.
Blue Cross's medical expert, Dr. Flynn, testified that the three to four month delay did not affect Mrs. Hymel's outcome from *203 her surgery, and that she would have had the same disabilities and deficits regardless of the delay. Additionally, Dr. Flynn stated that he did not think that the recurrence of the tumor was related to the three-month delay in the initial request for the MRI and the diagnosis of the tumor and the surgery because recurrence is very common in an ependymoma. However, Dr. Flynn acknowledged that he did not perform the surgery or see pictures of the tumor's size, and therefore would defer to the opinion of Dr. Awasthi as to the degree of the tumor's size and the degree or rate to which he opined it had grown in the period just before the surgery. Dr. Flynn also acknowledged, that had the tumor been removed at an earlier period, there would not have been an opportunity for the tumor to grow and further impinge upon Mrs. Hymel's spinal cord. Mrs. Hymel also testified that her symptoms progressively worsened during the period of delay and she further related that she became wheelchair-bound within the last few days before her first surgery.
After reviewing this evidence, we find that Mrs. Hymel met her burden of proving that her physical injuries were the direct and proximate result of the unreasonable delay, reduction, or denial of her request for medical services. Although the testimony of Dr. Flynn and Dr. Awasthi were conflicting, the jury obviously gave more deference to the opinion of Mrs. Hymel's treating physician, Dr. Awasthi. When there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at 844. Accordingly, we find the jury's factual finding that the defendant's refusal to perform its obligation under the contract caused Mrs. Hymel's injuries is fully supported by the record herein and is not manifestly erroneous.
F. Damages
On appeal, Blue Cross contends that the jury's award of $2,000,000.00 for mental anguish and loss or enjoyment of life should be reversed because La. R.S. 22:657 limits the damages that can be recovered "solely to the physical injuries" and because nonpecuniary damages cannot be recovered in an action for breach of contract. Additionally, Blue Cross asserts that the amount of damages awarded by the jury is "shocking" and grossly exceeds the jury's discretion.
The jury verdict form asked: "Do you find by a preponderance of the evidence that the failure of defendant to perform its obligations under the health insurance contract with Christy Hymel was a direct and proximate cause of any damages sustained by Christy Hymel." The jury responded yes and awarded Mrs. Hymel general damages in the total amount $2,050,000.00, which consisted of physical injuries including pain and suffering in the amount of $50,000.00 and mental anguish and loss of enjoyment of life in the amount of $2,000,000.00.
Generally, nonpecuniary damages are not recoverable in an action for the breach of a health insurance contract, or other insurance contact, unless the contract is intended to gratify a nonpecuniary interest or if the obligor, through his breach, intends to aggrieve or hurt the feelings of the obligee. See La. C.C. art. 1998; Breland v. Louisiana Hosp. Services, Inc., 468 So.2d 1215, 1222 (La.App. 1st Cir.1985); Nickels, 563 So.2d at 927; Bankston v. Alexandria Neurosurgical Clinic, 583 So.2d 1148, 1151 (La.App. 3rd Cir.1991). Since the jury found that the health insurance contract was not intended to gratify a nonpecuniary interest of Mrs. Hymel, she is not entitled to nonpecuniary damages as a result of Blue Cross's failure to perform its obligations under the health insurance contract, which resulted in an *204 unreasonable denial of the proposed medically necessary services.
However, in this case, not only did the defendant's conduct result in a breach of the insurance contract, thereby entitling Mrs. Hymel to pecuniary damages under general contract law, but the breach also caused physical injuries to Mrs. Hymel. Accordingly, in this case, La. R.S. 22:657(D) authorizes the award of damages for Mrs. Hymel's physical injuries.[19]
As previously set forth, La. R.S. 22:657(D) provides:
In any event where the contract between an insurer . . . and the insured . . . contains a provision whereby in non-emergency cases the insured is required to be prospectively evaluated through . . . pre-utilization review or screening procedure prior to the delivery of contemplated . . . medical services which are prescribed or ordered by a duly licensed health care provider . . . the insurer, . . . shall be held liable in damages to the insured only for damages incurred or resulting from unreasonable delay, reduction, or denial of the proposed medically necessary services or care . . . which damages shall be limited solely to the physical injuries which are the direct and proximate cause of the unreasonable delay, reduction, or denial as further defined in this Subsection together with reasonable attorney fees and court costs.[20]
(Footnote added.)
This statute does not prohibit the recovery of nonpecuniary damages; but rather, provides for an insurer's liability for all damages attributable "solely to the physical injuries" caused by the unreasonable denial of the proposed medically necessary services, which damages include not only physical pain and suffering, but also the mental anguish and loss of enjoyment of life sustained as a result of the physical injuries. See Frank L. Maraist and Thomas C. Galligan, Jr., Louisiana Tort Law, § 5.08 at p. 5-34 (2004) ("[M]ental distress [or anguish] that accompanies prior or contemporaneous physical injury is compensable; it sometimes is called `parasitic' and as such is an element of damages caused by the physical injury." (Emphasis added)).
A plaintiff is entitled to recover for all damages necessary to compensate for the physical injuries sustained. See McGee v. A C and S, Inc., XXXX-XXXX (La.7/10/06), 933 So.2d 770, 773. Compensatory damages are divided into special damages and general damages. Special damages are those, which have a ready market value, such that the amount may theoretically be determined with relative certainty, such as medical expenses and lost wages. General damages are those, which may not be fixed with any degree of pecuniary exactitude but which, instead, involve mental or physical pain or suffering, inconvenience, the loss of gratification or intellectual or physical enjoyment, or other losses of life or of lifestyle, which cannot really be measured definitively in *205 terms of money. McGee, 933 So.2d at 774. While pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury, loss of enjoyment of life refers to detrimental alterations of a person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury. McGee, 933 So.2d at 775. Thus, pain and suffering, mental anguish, and loss of enjoyment of life resulting from a physical injury are included as separate elements of damages for the physical injury. Accordingly, we find no error in the jury's determination that Mrs. Hymel's damages for physical injuries included her general damages for pain and suffering, mental anguish, and loss of enjoyment of life.
With regard to general damage awards,
[T]he discretion vested in the trier of fact is "great" and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993)
Mrs. Hymel was thirty-six years old at the time of trial. Mrs. Hymel testified that when she first woke up from surgery, she could not move her arms or head and she thought she was paralyzed. She felt painful burning sensations in her body and was not given the proper medication by the staff at Charity Hospital. While she was in the surgical ward of the hospital, she contemplated committing suicide. During her hospital stay, she suffered from bowel obstruction, fecal impaction, and had to wear diapers. Mrs. Hymel did not see her children in the hospital until two weeks after the surgery, and when her children finally saw her, they were scared of her and would not touch her. Mrs. Hymel spent approximately eight months in a wheelchair after her surgery.
Mrs. Hymel testified that her balance and equilibrium is off, she cannot feel the bottoms of her feet, and has to wear "Maw-Maw" shoes that cover her entire foot. Mrs. Hymel is house-bound, she cannot take a shower, work in her garden, ride a bike, swim, or drive, as she had frequently enjoyed prior to the surgery. Mrs. Hymel testified that she does not have sexual feelings anymore and is unable to have a sexual relationship with her husband. Mrs. Hymel must also take large doses of medication to relieve the burning and shocking sensations from which she suffers. She cannot be touched on her back or leg, because "[t]he second something touches [her] lower back, it's like fireworks that go off." Dr. Awasthi and Dr. Ganji testified that these disabilities and deficits are permanent. Dr. Awasthi also testified that two-thirds of these conditions were the direct result of the growth of the tumor during the three to four month delay in actually diagnosing it with the MRI.
In light of this evidence, we cannot say that the jury abused its vast discretion in making the awards of damages for the physical injuries suffered by Mrs. Hymel. Accordingly, we hereby affirm the jury's awards of $50,000.00 for the physical injuries including pain and suffering, and of $2,000,000.00 for mental anguish and loss of enjoyment of life, all of which were the direct and proximate cause of the unreasonable *206 denial of the proposed medically necessary services or care.

V. ANSWER TO APPEAL
A. Future Medical Expenses
The jury awarded Mrs. Hymel the sum of $15,000.00 for future medical expenses. In Mrs. Hymel's answer to the appeal, she contends that the jury's award was erroneous and an abuse of discretion because the uncontradicted testimony at trial demonstrated that she will incur approximately $228,989.00 in future medical expenses during her lifetime. Accordingly, she requests that the award for future medical expenses be increased to $228,989.00.
Future medical expenses must be established with some degree of certainty. Grayson v. R.B. Ammon & Assoc., Inc., 99-2597 (La.App. 1st Cir.11/3/00), 778 So.2d 1, 23, writs denied, XXXX-XXXX and XXXX-XXXX (La.1/26/01), 782 So.2d 1026 and 1027. However, an award for future medical expenses is by nature somewhat speculative. Id. An award for future medical expenses is justified if there is medical testimony that they are indicated and setting out their probable cost. See Brumfield v. Guilmino, 93-0366 (La.App. 1st Cir.3/11/94), 633 So.2d 903, 908, writ denied, 94-0806 (La.5/6/94), 637 So.2d 1056. In such a case, the court should award all future medical expenses which the medical evidence establishes that the plaintiff, more probable than not, will be required to incur. See Stiles v. K-Mart Corp., 597 So.2d 1012, 1012 (La.1992). An appellate court should not set aside an award for future medical expenses absent an abuse of the trier of fact's discretion. See Brumfield v. 633 So.2d at 909.
The testimony of Dr. Ganji and Dr. Awasthi established that as a result of the delay in the treatment of the tumor, Mrs. Hymel has sustained permanent damage to her spinal cord, which will require Mrs. Hymel to be on medication for the remainder of her life. The testimony of Dr. Ganji established that Mrs. Hymel is currently prescribed 3,400 milligrams of the prescription drug Neurontin. According to Dr. Ganji, Neurontin is generally prescribed for epilepsy; however, it has the "powerful" effect of blocking the unusual pain and burning sensations at the spinal cord level, thus enabling Mrs. Hymel to perform physical activities more comfortably. Mrs. Hymel testified that the cost of her medication is approximately $600.00 per month.
Holly Sharp, a certified public accountant testified on behalf of Mrs. Hymel as an expert in the area of economic loss valuation. She computed the present-day value of Mrs. Hymel's total future medical expenses to be $228,989.00. Ms. Sharp's projections were based on the assumption that Mrs. Hymel would incur $600.00 per month (or $7,200.00 per year) in medical expenses and that Mrs. Hymel's remaining life expectancy was approximately 44.94 years.[21]
Based on our review of the record, we find that the jury abused its discretion in awarding Mrs. Hymel only $15,000.00 in future medical expenses. The uncontradicted testimony in the record before us establishes the need for prescription medication for the remainder of Mrs. Hymel's life, and that the probable cost of this medication is approximately $7,200.00 per year. The sum awarded by the jury for future medical expenses would cover the cost of Mrs. Hymel's prescription medication for approximately two years. There is no factual basis in the record for such a conclusion, and therefore, such an award *207 was not reasonably within the jury's discretion. Rather, we find that the uncontradicted evidence established that Mrs. Hymel will, more likely than not, incur future medical expenses in the amount of $228,989.00, and as such, this was the only amount reasonably within the jury's discretion under the facts of this case. Accordingly, we hereby amend the trial court's judgment insofar as it awarded the plaintiff $15,000.00 in future medical expenses and we raise that award to $228,989.00.
B. Attorney Fees
Pursuant to La. R.S. 22:657(A) and (D), the trial court awarded Mrs. Hymel $101,600.00 in attorney fees. In Mrs. Hymel's answer to appeal, she contends that the trial court's award in this regard was erroneous and an abuse of discretion because the trial court considered only the time the attorneys had devoted to the case, and failed to consider the contingency fee contract that Mrs. Hymel had entered into with her attorneys.[22] Accordingly, Mrs. Hymel requests that her award for attorney fees under La. R.S. 22:657 be increased from $101,600.00 to $881,684.34 in accordance with the contingency fee contract, and further, that she be awarded additional attorney fees as were made necessary by this appeal.
Louisiana Revised Statutes 22:657 provides that the amount of attorney fees are to be determined by the court and are to be "reasonable." A contingency fee contract is not the sole basis upon which a court is to determine "reasonable" attorney fees as the term is used in La. R.S. 22:657. Crawford v. Blue Cross Blue Shield of Louisiana, 99-2503 (La.App. 1st Cir.11/3/00), 770 So.2d 507, 518, writ denied, XXXX-XXXX (La.2/16/01), 786 So.2d 98. Although a factor to consider, the use of a percentage of the recovery as the sole criteria is not consistent with the criteria established in the jurisprudence for a determination of the amount of an attorney fee. Id. Some factors the court should consider are the amount involved, the skill of the attorney, and the amount of work necessarily undertaken by the attorney.[23]Id. at 517. The trial court has much discretion in fixing an award of attorney fees under La. R.S. 22:657, and that award will not be modified on appeal absent a showing of an abuse of that discretion. Id. at 518.
In written reasons for judgment, the trial court stated:
At the outset the Court notes that this was a novel and difficult case which did require much time and labor from [Mrs. Hymel's] attorneys to present the matter at trial. Counsel for [Mrs. Hymel] were involved in the case for approximately four years before it was tried to a jury. The trial alone lasted three full days. [Mrs. Hymel's] counsel obtained a favorable result in the matter. In *208 order to obtain this favorable verdict, [Mrs. Hymel's] counsel was required to take risks such as the expensive costs involved with hiring medical experts. This case involved novel legal issues which required more research from [Mrs. Hymel's] attorneys than the average case. There were numerous issues litigated prior to, during, and after the trial. Counsel for [Mrs. Hymel] all have numerous years experience and exercised a high degree of professional skill while handling the case.
[Mrs. Hymel] did enter into a forty percent contingency fee contract with her attorney in this matter. If [Mrs. Hymel's] counsel were to recover forty percent of the judgment in this matter, attorneys' fees would be approximately $800,000.00. Counsel for [Mrs. Hymel] has submitted bills for work involved in this matter reflecting [total counsel's time at 508 hours] exclusive of time at the post trial hearing. . . . Based on all of the considerations set forth above, the court finds [a total of $101,600] a reasonable attorney fee to compensate [counsel] in this matter.
Having reviewed the record in light of the above record as well as the trial court's reasons for judgment, we find the award of attorney fees in the amount of $101,600.00 to be both reasonable and appropriate under the facts of this case. The trial court carefully considered the extent and character of the work performed, the intricacies of the case, the result obtained, the level of skill and diligence involved, the contingency fee contract, the number of hours worked, and the documents filed in this case, as well as the length of time involved in bringing the matter to trial before a jury. Therefore, we conclude that there was no abuse of discretion in the trial court's award of attorney fees in the amount of $101,600.00, and we decline to adjust the amount of the attorney fee award to reflect the contingency fee agreed to by Mrs. Hymel. However, we do recognize the additional efforts required by Mrs. Hymel's attorneys on this appeal, particularly in a case such as this one involving novel legal issues, and accordingly, we hereby award Mrs. Hymel an additional $5,000.00 in attorney fees.

VI. CONCLUSION
For the above and foregoing reasons, we amend the April 14, 2005 judgment of the trial court to award Mrs. Hymel $228,989.00 in future medical expenses and to award her an additional $5,000.00 in attorney fees, which were necessitated by this appeal. In all other respects, we affirm the judgment of the trial court.
All costs of this appeal are assessed to the appellant/defendant, HMO of Louisiana, Inc. d/b/a HMO Louisiana, Inc.
JUDGMENT AMENDED, AND AS AMENDED, AFFIRMED.
KUHN, J., concurs.
NOTES
[1] HMO of Louisiana, Inc. is a subsidiary of Blue Cross and Blue Shield of Louisiana.
[2] Louisiana Revised Statutes 22:2002(10) defines a "point of service policy" as "any policy of coverage that meets the definition of a health and accident insurance policy pursuant to Parts VI and XIV of Chapter 1 of this Title." In such policies, the member incurs charges or out-of-pocket expenses and files a claim for benefits under the policy.
[3] An HMO provides or arranges "for the provision of basic health care services to enrollees in return for a prepaid charge." La. R.S. 22:2002(7). In HMO subscriber agreements, the enrollees incur no charges or out-of-pocket expenses and no claim for benefits is filed.
[4] The claim for this x-ray was initially denied by Blue Cross as a charge incurred for a pre-existing condition. By letter dated April 27, 2001, Blue Cross overturned the denial, stating it had determined that the claimed service was not incurred for a pre-existing condition. During the trial of this matter, Blue Cross contended that this letter was a "mistake."
[5] According to Dr. Ganji, the "Babinski" test is performed by striking the sole of the foot with either a pencil or a fingernail and observing the movement of the big toe, i.e. whether it moves downward or backward. In a "normal" patient, the big toe will move downward; however, a patient who has a problem in the spinal cord or above (including the brain), the big toe will move backward.
[6] Dr. Ganji testified that an MRI scan is the "gold standard" test for diagnosing MS (or otherwise for ruling it out as a possible condition). Blue Cross does not dispute that a MRI scan was both appropriate and medically necessary to diagnose the condition from which Mrs. Hymel was suffering.
[7] We note that 1999 and 2000 W-2 forms, contained in the record of these proceedings, indicates that Mr. Hymel earned approximately $30,000 a year at Carpet Showcase, Inc. Mrs. Hymel was not employed.
[8] There are two major types of tumors that arise from inside the spinal cord; namely, an ependymoma and an astrocytoma. It was subsequently determined that Mrs. Hymel's tumor was an ependymoma, which is not cancerous, but is a malignant tumor.
[9] The plaintiff's petition for damages named as defendant "HMO of Louisiana, Inc. d/b/a HMO Louisiana, Inc. . . . a Louisiana health insurance company, authorized to do, and doing business in the State of Louisiana and providing health insurance therein." In the defendant's answer to the petition, it admitted these allegations but indicated that its proper name was "HMO Louisiana, Inc. . . . a health maintenance organization pursuant to La. R.S. 22:2001, et seq. . . ." The importance of this distinction is hereinafter discussed.
[10] Blue Cross also asserted as an affirmative defense that in the application for health coverage, Mrs. Hymel had made material and intentional misrepresentations regarding her health status, which rendered her contract with the defendant null and void. However, this defense was subsequently withdrawn and stricken by counsel for Blue Cross.
[11] Although the judgment on appeal herein indicates that the matter was tried before the jury on February 4, 5, and 6, 2005, both the minutes of the trial court and the transcript of the trial indicate that this matter was tried before the jury on February 2, 3, and 4, 2005.
[12] In written reasons for judgment, the trial court awarded attorney fees in the amount of $69,400.00 to one counsel of record for Mrs. Hymel and $32,200.00 to her other counsel of record. The judgment signed in accordance with this ruling awards the plaintiffs attorney fees in the total amount of $101,600.00.
[13] The plaintiffs filed a motion for judgment notwithstanding the verdict ("JNOV"), and the defendant filed a motion for new trial, for JNOV, and for remittitur. Pursuant to a judgment signed on July 11, 2005, the trial court denied both the plaintiffs' and defendant's motions.
[14] Mrs. Hymel's schedule of benefits provided:

THE WAITING PERIOD FOR PRE-EXISTING CONDITIONS IS APPLICABLE AS STATED UNDER "LIMITATIONS AND EXCLUSIONS" IN THIS CERTIFICATE.
[Mrs.] HYMEL BEGAN SERVING WAITING PERIOD ON 10/15/00.
[15] The basis of the defendant's objection to this instruction was that the trial court was to decide the issue of whether La. R.S. 22:657 was applicable.
[16] Louisiana Revised Statute 22:2002(7), provides that a

"Health maintenance organization" means any corporation organized and domiciled in this state which undertakes to provide or arrange for the provision of basic health care services to enrollees in return for a prepaid charge. The health maintenance organization may also provide or arrange for the provision of other health care services to enrollees on a prepayment or other financial basis. A health maintenance organization is deemed to be an insurer for the purposes of R.S. 22:213.6 [provisions prohibiting discrimination based on prenatal test results] and 213.7 [provisions prohibiting discrimination based on genetic information], Part XVI, comprised of R.S. 22:731 through 774 [provisions for rehabilitation, liquidation, conservation, dissolution, and administrative supervision], Part XXI-A, comprised of R.S. 22:1001 through 1015 [provisions of the Insurance Holding Company System Regulatory Law], and Part XXVI-B, comprised of R.S. 22:1241 through 1247.1, of Chapter 1 of this Title [provisions concerning insurance fraud]. A health maintenance organization shall not be considered an insurer for any other purpose.
Additionally, La. R.S. 22:5(10) provides that "`Insurer' includes every person engaged in the business of making contracts of insurance . . . A health maintenance organization is an insurer but only for the purposes enumerated in R.S. 22:2002(7)."
[17] Blue Cross does not challenge the amount of penalties and attorney fees assessed against it by the trial court.
[18] Causation is a question of fact. Green v. K-Mart Corp., 2003-2495 (La.5/25/04), 874 So.2d 838, 841. Factual determinations of the trier of fact may not be reversed absent manifest error or unless they are clearly wrong. Rosell, 549 So.2d at 844.
[19] Although the jury did not find that Blue Cross was in bad faith in failing to perform its obligations under the health insurance contract and did not find that the contract was intended to gratify a non-pecuniary interest of Mrs. Hymel, findings which would determine the type of damages Mrs. Hymel could recover under general contract law for the breach of the insurance contract, these finding are not relevant to the determination of the type of damages Mrs. Hymel was entitled to recover under La. R.S. 22:657(D).
[20] The parties do not dispute that Mrs. Hymel's policy requires claims to be prospectively evaluated through pre-utilization review or screening (or "pre-certified") prior to the proposed medical service.
[21] This figure was derived from the United States Life Tables (2002).
[22] The contingency fee contract contained in the record of these proceedings provides for an attorney fee of forty percent of all amounts recovered on behalf of Mrs. Hymel for this suit, and provides for an attorney fee of an additional ten percent (or fifty percent total) after appeal.
[23] See generally State, DOTD v. Williamson, State, 597 So.2d 439, 442 (La.1992), providing that the factors to be taken into consideration in determining the reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of court appearances; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge. See also Louisiana Rules of Professional Conduct 1.5(a).