# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 18-676


**JOHN THIBODEAUX, ET AL.**

**VERSUS**

**GULFGATE CONSTRUCTION, LLC, ET AL.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20154167
HONORABLE JULES DAVIS EDWARDS, III DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**BILLY HOWARD EZELL**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Billy Howard Ezell, and Candyce G. Perret, Judges.


**AFFIRMED AS AMENDED.**

Melvin A. Eiden
Blake T. Couvillion
Rabalais & Hebert
701 Robley Drive, #210
Lafayette, LA 70503
(337) 981-0309
COUNSEL FOR DEFENDANT/APPELLANT:
    J.M. Drilling, LLC

Edward O. Taulbee, IV
Taulbee & Associates
P.O. Box 2038
Lafayette, LA 70502-2038
(337) 269-5005
COUNSEL FOR PLAINTIFFS/APPELLEES:
    Amy Thibodeaux
    John Thibodeaux
    John and Amy Thibodeaux obo Gabrielle Thibodeaux
    John and Amy Thibodeaux obo Emily Thibodeaux

Max Michael Menard
P. O. Box 1196
Youngsville, LA 70592
(337) 857-6123
COUNSEL FOR PLAINTIFFS/APPELLEES:
    Amy Thibodeaux
    John Thibodeaux
    John and Amy Thibodeaux obo Gabrielle Thibodeaux
    John and Amy Thibodeaux obo Emily Thibodeaux

**EZELL, Judge.**

In this matter, J.M. Drilling ("J.M.") appeals decisions of the trial court below granting summary judgment in favor of John Thibodeaux on the issue of liability, excluding some of its expert testimony, and denying its motions for judgment notwithstanding the verdict (JNOV) or new trial. J.M. further appeals the jury awards made to Mr. Thibodeaux and his spouse as excessive. For the following reasons, we affirm the decision of the trial court, as amended.

The facts of this matter were described by this court in our previous case, *Thibodeaux v. Gulfgate Construction, LLC*, 17-495, pp. 1-2 (La.App. 3 Cir. 11/22/17), 234 So.3d 100, 102, *writ denied*, 17-2149 (La. 2/23/18), 237 So.3d 519, as such:

> This negligence matter arose on June 9, 2015, when Plaintiff, John Thibodeaux, injured his right leg while splicing fiber optic cable on behalf of his employer, American Telephone & Telegraph (AT & T), at 114 Meadow Gate Drive in the Sawgrass subdivision in Lafayette, Louisiana. Thibodeaux had to access hand holes, which are rectangular, underground vaults where fiber optic cables come together and are spliced. The two hand holes at issue were equipped with covers, i.e., lids, which rested on top of the ground. They were located near a rectangular, pre-cast slab which held an AT & T cabinet. On the day of his accident, Thibodeaux lifted a hand hole cover and placed it by the AT & T cabinet when the ground beneath him gave way, causing his right leg to fall into a hole, sustaining injury.

> Prior to Thibodeaux's accident, Gulfgate Construction and J. M. Drilling performed work on the property pursuant to separate contracts with AT & T. Gulfgate Construction's job, which was the F1 part of the project, consisted of preparing a pre-cast slab, installing a cabinet on top of the pre-cast slab, digging two hand holes, and feeding fiber optic cable into hand hole number two. After Gulfgate Construction finished its job, J. M. Drilling performed the F2 part of the project, which consisted of installing fiber optic lines by accessing the hand holes and feeding the cable out to the rest of the subdivision.

> It is alleged that during operations on the property . . . J. M. Drilling struck and damaged an underground sewer force main line. The main line purportedly began leaking and caused a washout under

the pre-cast slab upon which the AT & T cabinet was situated, ultimately forming the hole into which Thibodeaux fell. The main line, which ran from a sewer lift station on the property to the street, belonged to Water & Wastewater Utilities, Inc. (Wastewater), the owner and operator of the lift station. Gulfgate Construction repaired Wastewater's broken main line after Thibodeaux's accident. Wastewater had not marked its main line prior to the commencement of work performed by Gulfgate Construction and J. M. Drilling. The hand holes had to be repositioned as a result of the existence of the underground main line.

On August 24, 2015, Thibodeaux and his wife, Amy, individually and on behalf of their minor daughters, Gabrielle and Emily, filed suit against [J.M. Drilling,] Gulfgate Construction, Milton Water System, Inc., and Wastewater.

Gulfgate and the remaining Defendants in the suit were dismissed on summary judgments, which were upheld by this court and had writs denied by the supreme court. J.M. remains as the only defendant in this case.

Mr. Thibodeaux then filed a motion for summary judgment on the issue of liability, which was granted by the trial court. The suit then proceeded to a jury for the determination of damages. The jury awarded Mr. Thibodeaux, among other amounts, future medical expenses in the amount of $500,000.00; loss of future earning capacity in the amount of $2,275,000.00; loss of household services in the amount of $90,000.00; and loss of consortium to Mrs. Thibodeaux in the amount of $150,000.00. From that decision, J.M. appeals.

On appeal, J.M. asserts six assignments of error. J.M. claims that the trial court erred in granting Mr. Thibodeaux's motion for summary judgment on the issue of liability; it claims in separate assignments of error that the jury awards were excessive for future medical expenses, loss of future earning capacity, and loss of consortium; that the trial court erred in granting Mr. Thibodeaux's motion in limine precluding the testimony of Dr. Greg Gidman as duplicative; and it claims the trial court erred in denying its motion for new trial/JNOV.

## SUMMARY JUDGMENT

J.M. first claims that the trial court erred in granting summary judgment in favor of Mr. Thibodeaux on the issue of liability, as it claims genuine issues of material fact exist as to the cause of the hole. We disagree.

Summary judgment procedure is favored and "is designed to secure the just, speedy, and inexpensive determination of every action . . . . and shall be construed to accomplish these ends." La.Code Civ.P. art. 966(A)(2). In reviewing the trial court's decision on a motion for summary judgment, this court applies a de novo standard of review. *Jackson v. City of New Orleans*, 12-2742, 12-2743 (La. 1/28/14), 144 So.3d 876, *cert. denied*, ____ U.S. ____, 135 S.Ct. 197 (2014).

The burden of proof is on the mover unless the mover will not bear the burden of proof at trial, in which case the mover is not required to negate all essential elements of the adverse party's claim, but only to point out to the court the absence of factual support for one or more of the elements necessary to the adverse party's claim. La.Code Civ.P. art. 966(D)(1). "The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law." *Id*.

"After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(A)(3).

> A fact is material if it potentially ensures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute. A genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach

only one conclusion, there is no need for trial on that issue and summary judgment is appropriate.

*Jackson*, 144 So.3d at 882.

J.M. claims that the trial court erred in granting Mr. Thibodeaux's motion for summary judgment, as there exists a genuine issue of material fact as to the cause of the damage to the pipe. J.M. claims that the testimony of its employee, Mark Moore, that the J.M. crew never hit the pipe was sufficient to defeat the motion for summary judgment. We disagree.

The depositions and exhibits in the record paint a clear picture of what happened to cause the sinkhole that injured Mr. Thibodeaux. The pipe at issue was pressure tested and found to be working with no leaks as of December 9, 2014. Gulfgate and J.M. were the only contractors to work on the lot after that time. John Smith, a contractor for Gulfgate, testified that they uncovered the pipe while installing the hand holes that the fiber optic line would run through in January of 2015. They uncovered roughly ten to fifteen feet of pipe in order to avoid damaging it while working. He testified that the pipe was unharmed during their work on the hand holes. This testimony was confirmed by another Gulfgate contractor, Adam Romero, who was present during the work. Both men testified that Gulfgate recovered the pipe in an undamaged state.

Harold Broussard testified that he went to the lot for Gulfgate in February to do a site inspection as preparation for further work. There he encountered a contractor complaining about what a hassle the job was. When he returned to the site two days later, he encountered a large area of disturbed earth, as if a hole had been dug and recovered. This disturbed dirt was located in the area between the pre-cast slab and the street, between the hand holes, and atop the area where

4

Gulfgate had previously discovered the pipe. That area had not been dug up two days before. That day, he also found a ten to twelve-foot section of pipe that was bent and mangled, as if it had been pulled up by an excavator, laying on the ground. Again, that had not been there two days prior.

After Mr. Thibodeaux's accident, Mr. Smith and Mr. Romero returned to the job site to investigate for Gulfgate and AT&T. When they examined the sinkhole, they found that it went back from the hand hole to roughly a foot under the concrete slab. There, they found a broken section of pipe. This was the same pipe they had previously uncovered. They began digging from the slab toward the road to attempt to repair the pipe and found that a ten to twelve-foot section of pipe was completely missing. This matched the length of pipe found by Mr. Broussard, which was still laying in the lot at the time of the accident. The pulled, bent section of pipe matched the sewer line perfectly in size, type, and markings. Kelly Vice testified for Gulfgate, confirming Mr. Broussard's testimony that the pipe section in evidence looked like it had been pulled up and broken by an excavator. Mr. Romero testified that leaks from broken pipes would cause a washout and lead to a sinkhole.

Mark Moore testified for J.M., issuing blanket denials that his crew damaged the sewer line. However, he noted that J.M. dug in the vicinity with an excavator and it had done so assuming there was no sewer line in the area, despite the obvious presence of the sewer station fence just feet away from the work area. He admitted that J.M. dug deeper than the three-foot depth the sewer pipe was located at, noting that water filled the holes they dug, making it impossible to see the bottom of the holes. Critically, J.M. exhibit five, attached to his deposition, marks

5

the location of two bore holes dug by J.M., unquestionably placing them directly atop the damaged pipe.

Pictures show an area of disturbed earth atop the sewer line, as Mr. Broussard had described. Another picture, attached as Gamez one, shows that the fiber optic line installed by J.M. was situated a mere eight to twelve inches away from the sewer line, and located at a depth below it. Mr. Moore was clear that each of the bore holes J.M. was excavating in the direct area of the pipe were four feet square and at a depth of at least four feet due to the wet conditions.

It is clear that J.M. was digging in the vicinity of the sewer line, with an excavator, digging deeper than the broken pipe. It is near impossible that J.M. dug the two, four-foot square holes in the area marked in exhibit five at the depth indicated by Mr. Moore without hitting the pipe. This is clearly reiterated by the photo attached as Gamez one. J.M. offered no evidence supporting any other source of damage to the pipe. The record contains sufficient evidence to make it clear that J.M. damaged the sewer line, which precipitated the leak, that caused the sinkhole. We find that Mr. Moore's blanket denials do not create a genuine issue of material fact in the face of the other overwhelming evidence and that there remains no other reasonable hypothesis as to how the line was damaged. We can find no error in the trial court's finding that no genuine issue of material fact exists as to the cause of the damage to the pipe.

J.M. further claims a genuine issue of material fact exists in that it claims that it is possible that the dirt around the hand hole could have been improperly tamped down. J.M. claims this could have led to a hole being created, citing the deposition testimonies of Kelly Vice and Mr. Thibodeaux. Most crucially, neither of these men testified in the deposition excerpts attached to the motion for

summary judgment that improper tamping of the dirt would cause a sinkhole, but merely "sinkage."  Moreover, it is crystal clear that the void that caused Mr. Thibodeaux's injury was not mere sinking of the ground, but a collapse of a roughly three-foot sinkhole, as previously noted by this court.[1]  Further, this hypothesis completely ignores the ten foot, broken, and unearthed section of pipe in evidence.  "[A]ssertions of . . . implausible hypotheticals do not create genuine issues of material fact sufficient to defeat summary judgment."  *JPMorgan Chase Bank, N.A. v. Andrus*, 08-1160, p.5 (La. App. 3 Cir. 6/3/09), 10 So.3d 1286, 1290.  We find no error in the trial court's grant of Mr. Thibodeaux's motion for summary judgment.  This assignment of error is without merit.

### DAMAGES

J.M. next sets forth three assignments of error concerning damages awarded by the jury.  J.M. claims the jury abused its discretion in granting excessive awards for future medical damages, for future loss of earning capacity, and for loss of consortium.  We disagree as to future medical damages and loss of consortium, but agree as to future loss of earning capacity.

Our jurisprudence has consistently held that in the calculation of general damages, considerable discretion is left to the jury. *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976). The discretion vested in the jury is great, even "vast," so that an appellate court should rarely disturb an award of general damages. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).  Upon appellate review, general damage awards will

---

[1] In our previous grant of summary judgment to Gulfgate, this court noted it was a break in "the main line, which caused the leak, which caused the washout, which formed the hole into which Thibodeaux fell and was injured." *Thibodeaux*, 234 So.3d at 106.

7

be disturbed only when there has been a clear abuse of that discretion. *Coco*, 341 So.2d 332.

> The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. *Wainwright v. Fontenot,* 00–0492 (La.10/17/00), 774 So.2d 70, 74; *Youn*, 623 So.2d at 1261. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. *Youn*, 623 So.2d at 1260. Reasonable persons frequently disagree about the measure of general damages in a particular case. *Youn*, 623 So.2d at 1261. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. *Id*. If the appellate court determines that an abuse of discretion has been committed, it is then appropriate to resort to a review of prior awards, to determine the appropriate modification of the award. Prior awards under similar circumstances serve only as a general guide. In such review, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. *Id*.; *Theriot v. Allstate Ins. Co*., 625 So.2d 1337, 1340 (La.1993).

*Mack v. Wiley*, 07-2344, pp.15-16 (La. App. 1 Cir. 5/2/08), 991 So.2d 479, 490, *writ denied*, 08-1181 (La. 9/19/08), 992 So.2d 932. Damages awarded by a jury are to be reviewed in the light most favorable to the prevailing party. *O'Riley v. City of Shreveport*, 30,107 (La.App. 2 Cir. 1/23/98), 706 So.2d 213, *writ denied*, 98-752 (La. 5/1/98), 718 So.2d 418.

*Future Medical Awards*

J.M. first contends the jury erred in awarding excess damages for future medical expenses. J.M. notes that the $500,000.00 future medical damages award exceeds the costs set forth in the life care plans, which ran from roughly $400,000.00 to $430,000.00. However, the $500,000.00 award given by the jury may account for expenses related to contested Supartz injections to Mr. Thibodeaux's knee, as well as future surgeries, including a knee replacement

surgery and a hip nerve release, which were not in the life care plans. J.M. claims these expenses were not proven. We find that the medical testimony presented produced sufficient evidence to justify these awards.

As noted in *Goza v. Parish of West Baton Rouge*, 08-86, pp. 21-22 (La.App. 1 Cir. 5/5/09), 21 So.3d 320, 337, *writ denied*, 09-2146 (La. 12/11/09), 23 So.3d 919, *cert denied*, 560 U.S. 904, 130 S.Ct. 3277 (2010):

> An award of future medical expenses is justified if there is medical testimony that they are indicated and setting out their probable cost. *Hanks v. Seale*, 04–1485, p. 16 (La.6/17/05), 904 So.2d 662, 672. Nevertheless, when the record establishes that future medical expenses will be necessary and inevitable, courts should not reject the award because the record does not provide the exact value, if the court can determine from the record, past medical expenses, and other evidence a minimum amount that reasonable minds could not disagree would be required. *Levy v. Bayou Indus. Maintenance Services, Inc*, 03–0037, p. 9 (La.App. 1st Cir.9/26/03), 855 So.2d 968, 975, *writs denied*, 03–3161, 03–3200 (La.2/6/04), 865 So.2d 724 and 727. In such a case, the court should award all future medical expenses that the medical evidence establishes that the plaintiff, more probable than not, will be required to incur. *Hymel v. HMO of Louisiana, Inc*., 06–0042, pp. 26–27 (La.App. 1st Cir.11/15/06), 951 So.2d 187, 206, *writ denied*, 06–2938 (La.2/16/07), 949 So.2d 425. Although future medical expenses must be established with some degree of certainty, they do not have to be established with absolute certainty, as an award for future medical expenses is by nature somewhat speculative. *Grayson v. R.B. Ammon and Associates, Inc*., 99–2597, p. 35 (La.App. 1st Cir.11/3/00), 778 So.2d 1, 23, *writs denied,* 00–3270, 00–3311 (La.1/26/01), 782 So.2d 1026, 1027

Here, Dr. Stubbs testified that the damage to Mr. Thibodeaux's knee was chronic and permanent. He testified that it was more probable than not that Mr. Thibodeaux would need a knee replacement in the future due to his fall, though he was too young to undergo the procedure at this time. To hold Mr. Thibodeaux over until he reached an age where a knee replacement would be suitable, Dr. Stubbs testified that Supartz injections would be necessary. Dr. Stubbs stated that these injections would be useful in lubricating the knee to prevent further

deterioration and to prolong the life of Mr. Thibodeaux's natural knee. Dr. Stubbs' life care plan for Mr. Thibodeaux stated that these injections would be needed at a rate of five injections every six months for life. Mr. Thibodeaux testified that he wanted the injections in order to extend the time before a knee replacement, in order to prevent requiring a second knee replacement surgery, even if he did not experience any pain reduction with the injections. The jury's award including the Supartz injections was supported by the record, and we can find no error in the jury awarding the costs of those injections.

We further find that the above medical testimony produced a sufficient basis for the jury's finding that Mr. Thibodeaux will need other treatment for his knee problems for the rest of his life, including an eventual total knee replacement. Likewise, there exists in the record a reasonable factual basis for the jury's finding that a hip nerve release surgery would be required. Dr. John Sledge testified that the fall caused Mr. Thibodeaux to suffer from meralgia paresthetica, or numbness due to damage to the femoral nerve. He testified that this diagnosis was confirmed by two tests, a nerve block and an EMG. Dr. Sledge stated that because injections and physical therapy had not worked for Mr. Thibodeaux, he was likely to wind up needing nerve release surgery on his hip to alleviate his pain. Mr. Thibodeaux testified that, although he was hesitant to undergo additional surgery after his two knee surgeries failed to reduce his pain, he would plan on having the surgery. There was a reasonable factual basis in the record for the jury awarding Mr. Thibodeaux the costs of the nerve release surgery.

Although Mr. Thibodeaux failed to present any direct evidence as to the specific cost of these surgeries in the life care plans in evidence, future medical expenses are a legitimate item of damages even where the result of such future

treatment and its costs cannot be fixed with precision. *Guillory v. Avondale Shipyards, Inc.*, 448 So.2d 1281 (La.1984); *Bly v. Prudential Prop. and Cas. Ins.*, 589 So.2d 495 (La.App. 5 Cir. 1991). Moreover, the trial court can determine future medical expenses on the basis of the record, past medical expenses, and other evidence. *Levy*, 855 So.2d 968.

We find the awards beyond the life care plans for the future knee replacement to be reasonable in light of other jurisprudence. An award of $42,274.80 in future medical costs was awarded for a knee replacement in *Trueman v. City of Alexandria*, 01-1130 (La.App. 3 Cir. 5/15/02), 818 So.2d 1021, *writ granted*, 02-2166 (La. 11/15/02), 829 So.2d 410. This court also awarded $60,000.00 for each knee replacement surgery to the plaintiff in *Pryor v. Iberia Par. Sch. Bd.*, 10-23 (La.App. 3 Cir. 6/16/10), 42 So.3d 1015, *reversed on other grounds*, 10-1683 (La. 3/15/11), 60 So.3d 594.

Likewise, the life care plan submitted by Dr. Sledge set forth costs for lumbar nerve decompression at a cost of roughly $80,000.00, with half that cost being hospital costs and half being surgeon's costs. It is not unreasonable that the jury could use this as a basis to award a fraction of that amount for a hip nerve decompression.

The life care plans in the record show future medical expenses running from $400,000.00 to $430,000.00, without the required knee replacement and hip nerve release. The jury clearly considered the life care plans in the records, as well as the medical testimony setting forth the necessity for the additional future surgeries. The jury obviously raised the award from the life care plans to include what it felt were the approximate costs of future necessary surgeries. In light of the costs of the future care established in the life care plans and viewing the damages awarded

by the jury in the light most favorable to Mr. Thibodeaux as the prevailing party, we can find no abuse of the jury's vast discretion in its award of future medical expenses in the amount of $500,000.00.

*Loss of Future Earning Capacity*

We do, however, agree with J.M. as to the jury's findings as to Mr. Thibodeaux's loss of future earning capacity. The record contains two competing experts regarding loss of future earning capacity. Dr. Stuart Wood testified for J.M. that Mr. Thibodeaux's loss of future earning capacity was in the range of $471,360.16. However, Dr. Wood was heavily scrutinized by counsel for Mr. Thibodeaux regarding his methodology, and Dr. Wood himself testified that his number did not take into account Mr. Thibodeaux's planned retirement age, fringe benefits, yearly union raises, and that his numbers relied heavily on an average of Mr. Thibodeaux's past earnings, which deeply discounted a promotion Mr. Thibodeaux earned one year prior to the accident.

Dr. Wood's testimony was countered by that of Dr. George Rice, who used a much higher yearly lost wage based on Mr. Thibodeaux's recent promotion and the earnings of Mr. Thibodeaux's junior partner at AT&T, Chris Pacetti. Mr. Pacetti and Mr. Thibodeaux both testified that the two men had very similar attitudes toward work, overtime, travel, and making as much money as possible. They agreed that their hours would be a near exact match, though Mr. Thibodeaux was senior to Mr. Pacetti and, therefore, had greater opportunities for overtime and to earn more money. Dr. Rice used Mr. Thibodeaux's stated retirement goal in his calculations, and factored in the many fringe benefits Mr. Thibodeaux received from AT&T. Dr. Rice came to a calculation that Mr. Thibodeaux's loss of future earning capacity was $2,152,134.00.

We find that the jury simply found Dr. Rice's methodology and testimony more compelling, and that this amount was amply supported by the record. However, the jury awarded Mr. Thibodeaux $2,275,000.00, or $122,866.00 greater than any evidence in the record supports. We find $2,152,134.00 is the highest amount reasonably within the discretion of the fact finder under the circumstances of this case. As there is simply nothing in the record to support the greater award, the jury had no basis for it, and, thus, abused its discretion. We hereby reduce the award of loss of future earning capacity to $2,152,134.00.[2]

*Loss of Consortium*

J.M.'s final assignment of error concerning damages deals with the jury's award for loss of consortium. J.M. claims that the award of $150,000.00 is excessive. Loss of consortium includes pecuniary such elements as loss of services and nonpecuniary such components as loss of love, companionship, affection, society, sexual relations, comfort, and solace. See *Emery v. Owens-Corp.* 00-2144, (La.App. 1 Cir. 11/9/01), 813 So.2d 441, *writ denied*, 02-635 (La. 5/10/02), 815 So.2d 842.

The jury heard emotional testimony from Amy Thibodeaux, who stated that her husband of twenty-four years is a changed man since the accident. She stated that his daily struggles with his pain prevent him from doing simple things. The record reveals that Mr. Thibodeaux's activities have become limited due to his pain

---

[2] We note for thoroughness that the jury clearly believed Dr. Wood over Dr. Rice on the amount of *past* lost wages. There, the jury agreed with Dr. Wood that the lost wage damages were $205,935.00, rather than the $329,468.00 claimed by Dr. Rice. We note that the difference in the past lost wages award is almost exactly the amount awarded over what was proven for loss of future earning capacity. While it seems as if the jury may have been attempting some balancing between the two, the award for past wages was set forth with specificity and is final, as it has not been challenged in this court. Though we may feel we may understand what the jury was attempting to do with the awards, we cannot sustain a loss of future earning capacity award which has no factual support in the record.

and have stopped the couple from being able to do the outdoor activities that they loved doing together. The family can no longer take their yearly camping vacations because Mr. Thibodeaux can not do the work associated with their travel trailer. The family used to hunt, fish, and do several outdoor activities together. They can no longer do those things since the accident. Mr. Thibodeaux is no longer the "happy-go-lucky" man his wife once knew. His youngest daughter, Gabby, testified that he is now short-tempered and has great anxiety over bills. Mrs. Thibodeaux testified that the family's financial burden has fallen on her now that Mr. Thibodeaux can no longer work. She testified that she has to work more and longer hours to help make ends meet, and that the accident has changed her life, as well as his. She asserted that the entire family is struggling as a result of his injury.

The fact finder has much discretion in the assessment of general damages, including damages for loss of consortium. La.Civ.Code art. 2324.1. A loss of consortium award is a fact-specific determination to be decided on a case-by-case basis and is disturbed only if there is a clear abuse of discretion. *Lemoine v. Mike Munna, L.L.C.*, 13-2187 (La.App. 1 Cir. 6/6/14), 148 So.3d 205. After a review of the record, we find no abuse of the jury's discretion in its award of general and loss-of-consortium damages.

J.M. further challenges a separate award of $90,000.00 for loss of household services, claiming this is duplicative of the loss of consortium award. However, Dr. Rice provided testimony that the maintenance at Mrs. Thibodeaux's beauty salon would cost them between $92,920.00 and $111,904.00, as Mr. Thibodeaux could no longer provide that labor free of charge due to his injury and outside help would need to be hired. We do not find the $90,000.00 award duplicative. Rather, we

find it to be a separate claim with factual support in the record, and we, therefore, cannot find it to be an abuse of the jury's vast discretion.

## MOTION IN LIMINE

J.M. next claims that the trial court erred in granting Mr. Thibodeaux's motion in limine precluding the testimony of Dr. Greg Gidman on the basis that it would be cumulative. The trial court is vested with vast discretion in connection with the admissibility of evidence. It will not be reversed absent an abuse of that discretion. *Maddox v. Omni Drilling Corp.*, 96-1673 (La.App. 3 Cir. 8/6/97), 698 So.2d 1022, *writs denied*, 97-2766, 97-2767 (La. 1/30/98), 709 So.2d 706; *Tingle v. Am. Home Assurance. Co.*, 10-71, 10-72 (La.App. 3 Cir. 6/2/10), 40 So.3d 1169, *writs denied*, 10-1580, 10-1578, 10-1564, 10-1562 (La. 10/29/10), 48 So.3d 1095, 10-1562, 10-1563 (La. 10/29/10), 48 So.3d 1096. Dr. Gidman performed an independent medical examination on Mr. Thibodeaux, as did Dr. Stanley Foster, who's testimony was allowed. Counsel for J.M. indicated at the hearing below that Dr. Gidman's testimony would be the same as Dr. Foster's regarding Mr. Thibodeaux's knee injury. We cannot find that the trial court abused its vast discretion in finding that Dr. Gidman's testimony should be excluded as cumulative.

## JNOV

A motion for JNOV may be granted on the issue of liability, damages, or both. La.Code Civ.P. art. 1811. If the verdict is supported by competent evidence and is not wholly unreasonable, the trial judge may not set it aside. *Finnie v. Vallee*, 620 So.2d 897 (La.App. 4 Cir.), *writ denied*, 625 So.2d 1040 (La.1993). Based on our above findings concerning liability and damages, the jury's verdict is supported by the record and not unreasonable. Therefore, we pretermit any further

discussions regarding J.M.'s allegations regarding the trial court's denial of its motions for new trial and JNOV, as they are rendered moot by those above findings.

For the above reasons, the decisions of the trial court and jury below are hereby affirmed as amended. We amend the jury's award of loss of future earning capacity to reduce the award from $2,275,000.00 to $2,152,134.00. The decisions and awards are affirmed in all other respects. Costs of this appeal are hereby assessed against J.M. Drilling.

**AFFIRMED AS AMENDED.**