# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 22-162 consolidated with  22-163


ORIS LATOUR AND VIRGIE LATOUR

VERSUS

STEAMBOATS, LLC


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2018-2601
HONORABLE DERRICK D. KEE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

ELIZABETH A. PICKETT
JUDGE

\*\*\*\*\*\*\*\*\*\*


Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and D. Kent Savoie, Judges.


REVERSED IN PART; AFFIRMED
IN PART; AND RENDERED.

Rex D. Townsley
Jordan Z. Taylor
The Townsley Law Firm
3102 Enterprise Blvd.
Lake Charles, LA 70601
(337) 478-1400
COUNSEL FOR PLAINTIFFS- APPELLEES:
    Virgie Latour
    Oris Latour

**John P. Wolff, III**
**Sydnee D. Menou**
**Keogh, Cox & Wilson, LTD.**
**701 Main Street**
**Baton Rouge,LA 70821**
**(225) 383-3796**
**COUNSEL FOR DEFENDANTS-APPELLANTS**
**Nautilus Insurance Company**
**Steamboat's Seafood Warehouse, Inc.**

**PICKETT, Judge.**

A restaurant owner and its insurer appeal a jury's verdict awarding the plaintiffs damages after the husband plaintiff tripped and fell in the restaurant. For the following reasons, we reverse the trial court's judgment and conduct a de novo review.

## FACTS

On March 18, 2018, Oris Latour, Virgie (his wife), Nicholas (their son), his wife, and their children went to eat dinner at Steamboat Bill's restaurant in Lake Charles. Ms. Latour and the grandchildren proceeded to sit at a table while the others placed their orders. After ordering, Mr. Latour went to join Ms. Latour and the children. Mr. Latour wanted to sit across the table from Ms. Latour, but a group of boisterous men seated on that aisle was blocking the aisle. Mr. Latour decided not to disturb the men and went down the aisle behind Ms. Latour's seat with the intent to go around the end of the table to sit on the opposite side. The aisle was narrowed by diners sitting at the tables, and Mr. Latour had to turn sideways to negotiate his way down the aisle.

Mr. Latour traveled to the end of the aisle behind Ms. Latour. As he was moving behind her, his foot unexpectedly hit something, and he fell sideways toward the end of the table. When he fell, he hit the picket fence which was beyond the end of the table. Mr. Latour explained his right leg shot out from under him. As he got up, he realized he had tripped on a slab of concrete (the ledge). After being seated, he had tingling in his right foot and bad back pain.

When the waiter brought their meals, Mr. Latour reported he had tripped and fallen, hurting his back. He told the waiter he wanted to talk to the manager. As they were leaving the restaurant, Mr. Latour reported the accident to the manager. Mr. Latour testified he told the waiter and the manager that the ledge was a hazard

and that something needed to be done about it. He further testified the manager responded that is "why we push the table up against the ledge." The ledge was twenty-eight feet long by two feet wide by three and one-half inches high and was poured on top of the concrete floor. It was surrounded on three sides by a picket fence. On the fourth side, dining tables were situated at a ninety degree angle to the ledge, and the legs of the tables were butted up against the ledge.

The Latours sued Steamboat's Seafood Warehouse, Inc. d/b/a Steamboat Bill's and Nautilus Insurance Company, its insurer, (Steamboat Bill's) for damages, alleging the ledge was unreasonably dangerous under La.R.S. 9:2800.6. A jury trial was held June 28 through July 2, 2021. At the conclusion of the trial, the jury awarded Mr. Latour damages totaling $675,053 and Ms. Latour $83,060 in damages for loss of consortium. The jury assessed Mr. Latour with 20% fault. The trial court signed a judgment in accordance with the jury's verdict on July 19, 2021. Steamboat Bill's appealed the judgment.

## ASSIGNMENTS OF ERROR

On appeal, Steamboat Bill's assigns the following errors (footnote omitted) with the trial court proceedings:

1. The Trial Court abused its discretion when it refused to allow Appellants to present testimony that the asserted condition on which Plaintiff allegedly fell had never caused another reported trip and fall accident during the twenty-year history that Steamboat Bill's conducted business. Such an evidentiary exclusion is contrary to Louisiana Supreme Court cases that dictate the existence or absence of reported prior incidents is a factor that MUST be considered in connection with whether the condition presents an unreasonable risk of harm of which Appellant knew or should have known.

2. The Trial Court abused its discretion when it granted Plaintiffs' Motion for Adverse Presumption absent proof of Appellants' intent to spoliate, especially where the evidence established that Appellants had no knowledge of an accident or injury to place it on notice of anticipation of litigation, no intent and had a reasonable explanation for the non-preservation of evidence. It seriously compounded this error when it repeatedly instructed the jury that it must apply the

2

adverse presumption without offering any instruction that the presumption was rebuttable.

3. The Trial Court erred when it issued multiple jury instructions on La. C.C. Art. 2315. Such instructions confused the issues such that a reasonable jury could not have known to follow the mandate of La. R.S. 9:2800.6.

4. The Trial Court abused its discretion when it allowed Jason English to testify based on improper data and methodologies. This ruling, combined with the Court's prohibition on essential defense evidence, supplied prejudicial weight to all his opinions.

5. Multiple additional legal errors collectively constitute cumulative error that when coupled with other improper circumstances, was so prejudicial to Defendant–Appellants that they constitute reversible error, including, to wit:

   a) Subsequent remedial measures–Plaintiffs' counsel referenced subsequent remedial measures in violation of L[a]. C.E. Art. 407 and court rulings.

   b) Loss of consortium award–The jury committed clear error when it awarded Ms. Latour Latour $83,060.00 for loss of consortium.

   c) Award of costs–The Trial Court erred in taxing costs to Appellants.

## DISCUSSION

As a general rule, findings of fault and the assessment of fault are factual determinations and are reviewed under the manifest error-clearly wrong standard of review. *Courville v. Allstate Ins. Co.*, 16-556, 16-557 (La.App. 3 Cir. 3/8/17), 215 So.3d 310.

> If a trial judge commits consequential error by denying the jury relevant, admissible evidence, or by admitting evidence that should have been excluded, the fact finding process is interdicted; thus, the verdict is tainted. Generally, when a legal error interdicts the fact finding process, the manifest error standard no longer applies. If the record is otherwise complete, the reviewing court should conduct a *de novo* review and decide which party should prevail by a preponderance of the evidence.

*Said v. Federated Rural Elec. Ins. Exchange*, 21-78, p. 3 (La. 4/20/21), 313 So.3d 1241, 1243 (citations omitted). Therefore, the standard of review applied here will depend on our resolution of errors assigned by Steamboat Bill's.

We first review Steamboat Bill's complaint that the trial court refused to allow them to present evidence that Steamboat Bill's owner, Jason Felice, was unaware of any accident being caused by the ledge since he became owner of Steamboat Bill's in 2015. The Latours raised this issue in a motion in limine, arguing that allowing such argument would be "highly misleading" and "unfairly prejudicial." At the hearing on the motion, the trial court granted the Latours' request finding Mr. Felice's testimony was "not provable" and would "mislead everyone."

Steamboat Bill's argues the trial court's ruling is manifestly erroneous because the history of prior accidents is a factor to be considered by the fact finder when considering whether the ledge constituted an unreasonable risk of harm. *See Reed v. Wal-Mart Stores, Inc.*, 97-1174 (La. 3/4/98), 708 So.2d 362; *Boyle v. Bd. of Sup'rs, Louisiana State Univ.*, 96-1158 (La. 1/14/97), 685 So.2d 1080. In light of this jurisprudence, we find the trial court erred in not allowing Mr. Felice to testify that during his time as owner of Steamboat Bill's, he was personally not aware of any accidents caused by or attributed to the ledge.

We next consider whether the trial court abused its discretion in granting an adverse presumption in favor of the Latours because of Steamboat Bill's failure to preserve a video recording of the accident. The Latours argued they were entitled to an adverse presumption that the video recording was detrimental to Steamboat Bill's defense because it failed to preserve the video recording and allowed it to be overwritten by later video recordings. Steamboat Bill's acknowledged it records activities in the restaurant but argued the presumption does not apply because it did

4

not have a written policy for reporting and documenting accidents and its failure to preserve the video recording was not intentional. The trial court granted the Latours' request and instructed the jury, "The failure of a party to produce evidence within his control raises a presumption that the evidence would have been detrimental to his case," then immediately repeated the instruction to the jury. The trial court also refused to allow Steamboat Bill's to present Mr. Felice's testimony that the video was not preserved because his staff had not reported the accident to him pursuant to Steamboat Bill's oral policy regarding accidents and he had no knowledge a lawsuit would be filed. Steamboat Bill's proffered Mr. Felice's testimony on this issue. He testified Steamboat Bill's employees are instructed to report accidents to him and that when an accident is reported, he reviews the video recordings and downloads the video segment of the accident to a thumb drive. He also testified the restaurant's video recordings are automatically overwritten after sixty days.

"Where a litigant fails to produce evidence available to him and gives no reasonable explanation, the presumption is that evidence would have been unfavorable to his cause." *Salone v. Jefferson Par. Dep't of Water*, 94-212, p. 6 (La.App. 5 Cir. 10/12/94), 645 So.2d 747, 750 (quoting *Boh Bros. Const. Co., Inc. v. Luber-Finer, Inc.*, 612 So.2d 270, 274 (La.App. 4 Cir. 1992), *writ denied*, 614 So.2d 1256 (La.1993)). However, this "presumption is not applicable where the failure to produce the evidence is explained." *Id*. A party's failure to produce evidence has been found to be reasonable where there is no evidence showing the party knew suit would be filed when the evidence at issue was discarded and the need for the evidence was not foreseeable. *BancorpSouth Bank v. Kleinpeter Trace, L.L.C.*, 13-1396 (La.App. 1 Cir. 10/1/14), 155 So.3d 614, *writ denied*, 14-2470 (La. 2/27/15), 159 So.3d 1067. In *Carter v. Hi Nabor Super Market, LLC*,

5

13-529 (La.App. 1 Cir. 12/30/14), 168 So.3d 698, *writ denied*, 15-190 (La. 4/17/15), 168 So.3d 399, the court determined the defendant's failure to preserve a video recording of an accident before it was overwritten did not warrant the imposition of an adverse presumption. The plaintiff's attorney had notified the defendant he had been retained to represent the plaintiff in connection with the accident. Nevertheless, the court refused to impose the presumption because the defendant had no knowledge of a pending lawsuit or any indication that suit would be filed when the video recording was overwritten. Other than Mr. Latour's reporting his accident to Steamboat Bill's, there is no evidence the Latours asked Steamboat Bill's to preserve any video recording of the accident.

In *Sayre v. PNK (Lake Charles), LLC*, 15-859 (La.App. 3 Cir. 3/23/16), 188 So.3d 428, *writ denied*, 16-696 (La. 6/28/16), 192 So.3d 780, this court outlined the defendant's detailed written policies and procedures which require certain actions be taken after an accident occurred on its premises and held the trial court erred in refusing to instruct the jury on adverse presumption for the defendant's failure to produce video of the plaintiff's slip and fall. The court discussed the case of *Grantham v. Eldorado Resort Casino Shreveport*, 49,474 (La.App. 2 Cir. 11/19/14), 152 So.3d 1028, *writ denied*, 14-2654 (La. 3/6/15), 160 So.3d 1290, where the second circuit determined testimony regarding a defendant's usual practice of preserving a video recording of a fall without a written policy was insufficient to apply the presumption. The *Grantham* court held "the duty to preserve evidence is enforceable if it arose from a statute, contract, special relationship between the parties or an affirmative agreement or undertaking to preserve the evidence." *Id*. at 1031 (quoting *Acadian Gas Pipeline Sys. v. Nunley*, 46,648, p. 14 (La.App. 2 Cir.11/2/11), 77 So.3d 457, 465, *writ denied*, 11-2680 (La. 2/10/12), 80 So.3d 487). *Sayre*, 188 So.3d at 436, noted the "bright contrast"

between PNK's detailed written policy and the unwritten policy in *Grantham* before concluding the plaintiff was entitled to an adverse presumption.

In *Hypolite v. Scott Partners MLT, Inc.*, 19-704, p. 9 (La.App. 3 Cir. 4/1/20*)*, 297 So.3d 868, 874, this court followed *Grantham* and determined the plaintiff was not entitled to an adverse presumption because the defendant did not have any "written instructions or procedures." Unlike *Sayre*, 188 So.3d 428, the facts herein are comparable to the facts in *Grantham*, 152 So.3d 1028, and *Hypolite*, 297 So.3d 868, as Steamboat Bill's policy is more akin to the policy at issue in *Grantham* and the policies and procedures discussed in *Hypolite*.

As discussed above, Steamboat Bill's had no notice it needed to the preserve video recording of the accident until the Latours filed suit three months after the accident when it had already been overwritten. For these reasons, we find the evidence does not establish Steamboat Bill's intentionally failed to preserve video of the accident and the trial court erred in granting the Latours' request for an adverse presumption for Steamboat Bill's failure to preserve it.

Considering these two evidentiary errors in light of the entire record, we find they substantially affected the outcome of the case and constitute reversible error. *Said*, 313 So.3d 1241. "*De novo* review should be limited to consequential errors, that is, errors which prejudiced or tainted the verdict rendered." *Maldonado v. Kiewit La. Co.*, 12-1868, p. 8 (La.App. 1 Cir. 5/30/14), 152 So.3d 909, 918-19, *writ denied,* 14-2246 (La. 1/16/15), 157 So.3d 1129. These legal errors pertain only to Steamboat Bill's liability. The jury's assessment of damages is a factual finding which was not was interdicted by the legal error. Accordingly, we will conduct a de novo review of liability only. *Perdue v. Cruse*, 09-1446 (La.App. 3 Cir. 6/2/10), 38 So.3d 1235. Steamboat Bill's assigns error only with the jury's award for Ms. Latour's loss of consortium claim, which we will review under the

manifest error standard of review. *Thibodeaux v. Donnell*, 16-570 (La. 1/20/17), 219 So.3d 274.

**Liability**

The Latours' claims against Steamboat Bill's are based on La.R.S. 2800.6 which governs negligence claims against merchants. Under La.R.S. 9:2800.6(A), "A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition." A merchant must make "a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage." *Id.* Nonetheless, "merchants are not insurers of their patrons' safety," and customers have a concurrent "duty to use ordinary care to avoid injury." *Marks v. Schultz*, 20-197, p. 7 (La.App. 1 Cir. 12/10/20), 316 So.3d 534, 539.

To succeed with their claims, the Latours must prove:

(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.

(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.

(3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.

La.R.S. 9:2800.6 (B). A plaintiff must prove each of the three elements set forth in La. R.S. 9:2800.6(B), and his failure to do so is "fatal to the plaintiff's case." *Planchard v. New Hotel Monteleone, LLC*, 21-347, p. 4 (La. 12/10/21), 332 So.3d 623, 626.

### *Unreasonable Risk of Harm*

In *Hutchinson v. Knights of Columbus, Council No. 5747*, 03-1533, pp. 9-10 (La. 2/20/04), 866 So.2d 228, 235, the supreme court outlined the risk-utility

8

balancing test used to determine whether something presents an unreasonable risk of harm and constitutes an unreasonably dangerous condition, which requires the trier of fact to consider and balance four factors: "the utility of the complained-of condition; the likelihood and magnitude of harm, which includes the obviousness and apparentness of the condition; the cost of preventing the harm; and the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature." The question for the trier of fact is whether the social value and utility of the thing justifies the potential harm to others. *Reed*, 708 So.2d 362.

Mr. and Ms. Latour and Nick Latour testified at trial regarding the facts surrounding Mr. Latour's accident. Ms. Latour and Nick addressed what happened after Mr. Latour tripped and fell, relating what they observed or heard of Mr. Latour's reaction to the accident and his reports to the waiter and manager. During trial and on appeal, Steamboat Bill's argues the Latours' testimony is not reliable pointing to snippets of deposition testimony and trial testimony which it asserts are contradictory. Steamboat Bill's did not produce the waiter and the manager to contradict the Latours' testimony. Considering the Latours' testimony as a whole, we find nothing in their testimony that casts doubt on their credibility.

### Utility of the Ledge

The ledge originally served as the base for a display case. When the grocery store was converted to Steamboat Bill's restaurant, it no longer served a purpose. This fact is evidenced by Steamboat Bill's attempt to prevent diners from having access to it. Steamboat Bill's argues the ledge did serve a purpose–high chair storage. Mr. Latour testified that when he reported his accident to Steamboat Bill's manager, the manager replied that is "why we push the table up against the ledge" This statement shows the high chairs were stored on the ledge in an attempt to

9

block access to the ledge.  Photographs of the ledge[1] show only a few high chairs were stored on the twenty-eight foot by two foot ledge, and Mr. Latour testified no high chairs were on the ledge when his accident occurred.

**Likelihood and Magnitude of Harm**

This prong of the risk-utility inquiry focuses on whether the dangerous or defective condition is obvious and apparent.  *Bufkin v. Felipe's Louisiana, LLC*, 14-288 (La. 10/15/14), 171 So.3d 851.  For a condition to be considered obvious and apparent, it "should be one that is open and obvious to everyone who may potentially encounter it."  *Id*. at 856.  Accordingly, this inquiry "focuses on the global knowledge of everyone who encounters the defective thing or dangerous condition, not the victim's actual or potentially ascertainable knowledge."  *Broussard v. State ex rel. Office of State Bldgs.*, 12-1238, p. 18 (La. 4/5/13), 113 So.3d 175, 188.

Expert Testimony

The Latours and Steamboat Bill's presented expert testimony to address the issue of whether the ledge presented an unreasonable risk of harm.  The Latours' expert was Jason English, a safety engineer, and Steamboat Bill's expert was Michael Bellard, a civil engineer who practices as a contractor.  Mr. English is an expert in the field of safety engineering.  In the context of this case, he has knowledge of building and fire codes, the design and maintenance of anything one could use to walk on, whether a level surface, stairway, or ramp; human visual characteristics while walking; unanticipated characteristics in walking surfaces; the application of scientific and technical principles for identifying, controlling, minimizing, and eliminating hazards that may cause people injury.  In his

---

[1] The photographs were taken when the restaurant was not busy with only a few diners seated at tables.  No diners were seated on the aisles adjacent to the ledge.

testimony, Mr. English integrated the ledge's noncompliance with code regulations and safety factors, such as visual characteristics of the ledge and surrounding area, that affect walking and safety principles. Considering Mr. English's experience and testimony on the issues presented herein, we will consider his testimony in our review.

Mr. English acknowledged the ledge did not satisfy the definition of a walkway or area of egress but opined a walkway is any foreseeable pedestrian path and no area should be accessible as a walkway if it is not intended to be one. He also explained a condition should not be evaluated solely in terms of its intended use but in terms of how it can be used and a building owner must consider foreseeable misuse by patrons. Continuing, he explained the ledge did not comply with code regulations applicable to walkways. He concluded it was foreseeable diners would use the ledge as a walkway to get high chairs; therefore, it should comply with codes applicable to walkways.

Mr. English testified the configuration of the dining tables with relation to the ledge and the picket fence affected one's ability to see the ledge before they encountered it. He testified that diners seated at the tables reduced the view of the aisle and the visibility of the ledge. He also explained the legs of the table where Mr. Latour tripped were pushed up against the ledge such that the table top extended over the ledge by approximately four inches and cast a shadow below it on the ledge. He observed the floor and the ledge were the same dark color which caused the two to blend together visually and further obscure the view of the ledge. In his opinion, these elements camouflaged the ledge and caused it to be visually hidden and unexpected by diners, thereby creating a hazard that could cause diners to trip.

Mr. English acknowledged the ledge was not invisible "if you happened to look at it" but noted nothing in the area where the accident occurred draws attention to the ledge away from other competing elements, like trying to avoid seated diners and talking to other diners, to make one look down and see the ledge. He specifically observed the fence was positioned approximately two feet beyond the end of the table and opined the fence actually drew a person's attention away from the ledge under the table rather than to it. Mr. English opined that due to the distance between the table and the fence, a diner would have no reason to believe the aisle ended at the end of the table. In his opinion, the fence likely increased the hazard of the ledge and concluded the ledge is unreasonably dangerous.

Mr. Bellard is a civil engineer who practices as a contractor, not an engineer. He has been qualified as an expert in cases involving engineering only as it relates to construction matters. He has never been qualified as a safety engineer or expert in safety. Mr. Bellard acknowledged Steamboat Bill's had a duty to protect its diners from tripping hazards but countered Mr. English's opinions, testifying the ledge is 100% code compliant and the fire marshal would have cited Steamboat Bill's for noncompliance, but it had not. He explained codes applicable to the ledge are written with the expectation that the public is going to use reasonable care as they traverse about walkways, pathways, and ways of ingress and egress. In Mr. Bellard's opinion, it was not reasonably foreseeable that people would walk on the ledge to go around the end of a table because the ledge was used for high chair storage. He also opined the fence alerted the public to the ledge's presence and the ledge was open and obvious from the angle that Mr. Latour approached it. Mr. English and Mr. Bellard's opinions on this factor were diametrically opposed. Mr. Bellard was not qualified to and did not give consideration to the visual and safety factors outlined by Mr. English. Moreover, Mr. Felice acknowledged the

ledge could be camouflaged based on the angle a person looks at it. For these reasons, we find the ledge was not open and obvious to everyone who encountered it.

### Cost of Preventing the Harm

Mr. English outlined the cost of three methods to prevent the harm the ledge presented: (1) removal of the ledge with a jackhammer would cost $5,000, 2) completion of the picket fence on the fourth side to prevent access to the ledge would cost $500, and (3) painting the ledge yellow to draw attention to it and make it more visible would cost $200. His testimony was not refuted.

### Nature of the Plaintiff's Activity

This factor includes consideration of "the circumstances, the particular plaintiff involved, and any specialized or superior knowledge that plaintiff may possess." *Fisher v. Villere*, 20-242, p. 11 (La.App. 4 Cir. 2/24/21), 313 So.3d 1282, 1290. Mr. Latour's dining in a restaurant was not remarkable or dangerous by nature and did not involve any specialized knowledge of the premises.

Based on our de novo review, we find the Latours proved the ledge created an unreasonable risk of harm. In making this determination, we have considered that Mr. Felice had no knowledge of prior accidents and that Steamboat Bill's had not been cited for any code violations. A history of no accidents is but one factor to be considered when determining if an unreasonable risk of harm exists, and such history does not automatically relieve a defendant of liability. *Head v. St. Paul Fire & Marine Ins. Co.*, 408 So.2d 1174 (La.App. 3 Cir.), *writ denied*, 412 So.2d 99 (La.1982); *Rispone v. Louisiana State Univ. & Agric. & Mech. Coll.*, 93-1057 (La.App. 1 Cir. 5/20/94), 637 So.2d 731. The same is true of compliance with building codes. *Primeaux v. Best W. Plus Houma Inn*, 18-841 (La.App. 1 Cir. 2/28/19), 274 So.3d 20.

### *Actual or Constructive Notice*

Constructive knowledge is proved when evidence establishes the condition that caused the injury existed for such a length of time, the responsible party must have discovered it in the exercise of ordinary care and diligence. *Joseph v. City of New Orleans*, 02-1996 (La.App. 4 Cir. 3/5/03), 842 So.2d 420. An owner cannot ignore a dangerous condition on his property and rely on "this self-imposed ignorance or lack of diligence" to deny liability. *Dronette v. Shelter Ins. Co.*, 08-654, p. 4 (La.App. 3 Cir. 12/10/08), 998 So.2d 942, 945.

The evidence shows Steamboat Bill's had knowledge of the ledge for many years and sought to prevent diners from encountering it by fencing it on three sides, pushing tables against it on the fourth side, and placing high chairs on it. Furthermore, Mr. Felice acknowledged he had seen people walk on the ledge but testified he did not believe it presented a danger. Thus, Steamboat Bill's had actual notice of the ledge and constructive notice of the danger it presented to diners.

### *Reasonable Care*

Steamboat Bill's knew the ledge posed a hazard to its diners and barricaded it on three sides but arranged dining tables, dining chairs, and high chairs in an attempt to barricade the fourth side as well. In doing so, Steamboat Bill's failed to use reasonable care to insure diners would be able to see the ledge, appreciate its danger, and avoid it.

For these reasons, we find the Latours met their burden of proving negligence under La.R.S. 9:2800.6.

## Assessment of Fault

In *Watson v. State Farm Fire & Casualty Insurance Co.*, 469 So.2d 967, 974 (La.1985) (citing the Uniform Comparative Fault Act, Section 2(b)), the supreme court outlined how comparative fault is to be assessed:

> In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.

> In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) did the conduct result from inadvertence or did it involve an awareness of the danger, (2) how great was the risk created by the conduct, (3) what was the significance of the parties' conduct, (4) what were the capacities of the actor, whether superior or inferior, and (5) did the circumstances require the actor to proceed quickly without considering his actions.

We have considered the nature of Steamboat Bill's conduct in partially barricading the ledge from diners' access and partially camouflaging the ledge from view on the only side accessible by diners. This arrangement shows Steamboat Bill's recognized the ledge was a hazard. We see no reason, other than reduced seating for diners, for not completely barricading the ledge. Steamboat Bill's actions created a risk for diners. We have also considered Mr. Latour's decision not to go down the aisle where his intended seat was located and his failure to see the ledge as moved down the aisle. Mr. Latour testified he did not look at his feet as he moved down the aisle and that due to the space between the table and the fence, he believed he could walk around the end of the table to sit on the other side of it. We assess Steamboat Bill's with 85% fault and Mr. Latour with 15% fault.

### *Loss of Consortium*

Steamboat Bill's argues the jury's award of $83,060 to Ms. Latour for her loss of consortium claim constitutes error.

> The compensable elements of damage in a loss of consortium claim are loss of society, sex, service, and support. "Society" is broader than loss of sexual relations. It includes general love, companionship, and affection that the spouse loses as a result of the injury. "Support" is the lost family income that would go to support the uninjured spouse. "Service" is the uncompensated work around the house or educational help with the children which will, as a result of the injury, have to be obtained from another source and at some price.

*Rowe v. State Farm Mut. Auto. Ins. Co.*, 95-669, p. 22 (La.App. 3 Cir. 3/6/96); 670 So.2d 718, 731, *writ denied*, 96-842 (La. 5/17/96); 673 So.2d 611.

After being married for more than forty years, Ms. Latour's marital, family, social, and home life changed significantly as a result of Mr. Latour's injuries. Ms. Latour testified Mr. Latour had always been the provider but could no longer do the work he had done before his accident. She explained he became a different person–withdrawn and having mood swings. Mr. Latour's injuries caused him to move and moan in his sleep which disturbs her sleep. Ms. Latour does not have a housekeeper. Now, in addition to taking care of the home, she also does outdoor chores as well. Ms. Latour testified that she now helps feed their animals. This requires her to lift fifty pound feed bags. Mr. Latour does help with this chore when he can. Ms. Latour testified that because of these additional chores, she now has pain she never had before.

Ms. Latour also explained their life as a couple changed greatly. She acknowledged they spend more time together now than before the accident, but testified they no longer enjoy the closeness they shared for so many years. She lamented that their family gatherings are no longer as much fun because Mr. Latour is often in pain, which causes him to be irritable and standoffish, such that he cannot enjoy being with his family. She also testified they can no longer dance together and dancing had been one of their favorite activities. Other than referencing the loss of closeness, Ms. Latour did not specifically address their

16

intimacy. Mr. Latour, however, reported he had sexual dysfunction after the accident to his neuropsychologist, who recommended family therapy for him and Ms. Latour to address the issue.

The jury has much discretion in assessing damages for loss of consortium. La.Civ.Code art. 2324.1. A loss of consortium award is a fact-intensive determination that is unique to each case and will be disturbed only where a clear abuse of discretion is found. *Thibodeaux v. Gulfgate Constr., LLC*, 18-676 (La.App. 3 Cir. 3/7/19), 270 So.3d 721. Our review of the record reveals no abuse of discretion in the jury's award of $83,060 for Ms. Latour's loss of consortium damages, and it is affirmed.

## DISPOSITION

For the reasons discussed herein, errors committed by the trial court interdicted the trial proceeding requiring this court to conduct a de novo review of liability. After conducting a de novo review, we assess Steamboat Bill's with 85% fault and Mr. Latour with 15% fault. We further affirm the jury's award for loss of consortium damages against Steamboat's Seafood Warehouse, Inc. d/b/a Steamboat Bill's and Nautilus Insurance Company, together with legal interest thereon from the date of judicial demand. All costs are assessed against Steamboat's Seafood Warehouse, Inc. d/b/a Steamboat Bill's and Nautilus Insurance Company.

**REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.**